JERRY D. SHOECRAFT, APPELLEE, V. CATHOLIC SOCIAL SERVICES BUREAU, INCORPORATED, A NONPROFIT NEBRASKA CORPORATION, AND JOHN DOE AND MARY DOE, REAL AND TRUE NAMES UNKNOWN, APPELLANTS, DEPARTMENT OF SOCIAL SERVICES, STATE OF NEBRASKA, APPELLEE.

385 N.W.2d 448

Filed April 25, 1986.   No. 85-657.

James M. Kelley, and Patrick W. Healey of Healey, Brown, Wieland, Kluender, Atwood & Jacobs, for appellants.

Roger C. Lott, for appellee Shoecraft.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

WHITE, J.

This is an appeal from an order of the district court for Lancaster County holding that Neb. Rev. Stat. §§ 43-104.02 et seq. (Reissue 1984) are void as violative of the U.S. and Nebraska constitutional guarantees of due process and equal protection. Section 43-104.02 provides in part:

(1) Relinquishment or consent for the purpose of adoption given only by a mother of a child born out of wedlock pursuant to section 43-104 shall be sufficient to place the child for adoption and the rights of any alleged father shall not be recognized thereafter in any court unless the person claiming to be the father of the child has filed with the Department of Social Services on forms provided by the department, within five days after the birth of such child, a notice of intent to claim paternity.

Section 43-104.04 provides:

If a notice of paternity is not filed within five days, the mother of a child born out of wedlock or an agent specifically designated in writing by the mother may request, and the Department of Social Services shall supply, a certificate that no notice of intent to claim paternity has been filed with the department and the filing of such certificate pursuant to section 43-102 shall eliminate the need or necessity of a consent or relinquishment for adoption by the natural father of such child.

Petitioner, the father of a baby boy born out of wedlock on February 19, 1985, filed a notice acknowledging paternity of the child on February 28, 1985, nine days after the birth. The

child was relinquished by the mother to appellant Catholic Social Services Bureau, Incorporated, thereafter, and custody was placed with the prospective adoptive parents, designated as John and Mary Doe.

The action was cast in the form of an application for writ of habeas corpus alleging paternity, acknowledgment, and subsequent relinquishment by the mother. Habeas corpus is an appropriate action to test the legality of custody and best interests of a minor, including the rights of fathers of children born out of wedlock. *In re Application of Schwartzkopf*, 149 Neb. 460, 31 N.W.2d 294 (1948); *Christopherson v. Christopherson*, 177 Neb. 414, 129 N.W.2d 113 (1964).

The parties were students at the University of Nebraska at the time the mother became pregnant. The fact of the pregnancy was communicated to the appellee father as soon as it was verified by the mother. Appellee suggested a second examination, and the pregnancy was confirmed and communicated to appellee, "[p]ositively [in] June" 1984.

During the period of the pregnancy, the parties remained in contact with one another. Extended discussions were had concerning the prospective birth and the fate of the child. As long as $3^{1}/_{2}$ to 4 months prior to the birth, the appellee father knew that arrangements were made by an agency to place the mother in a home outstate and of the mother's possible plans to relinquish the child at the hospital.

The appellee father did not pay any of the expenses connected with the residence of the mother before the birth nor any of the costs of the hospital and physician. During the period before the birth, medical questionnaires were submitted and presumably sent to the appellee father by the mother. Appellee did not complete the questionnaires, nor did he return them to the mother.

The appellee father was notified of the birth on the date of the birth and visited the mother shortly after the birth. Appellee points out that he executed no consent to an adoption or relinquishment. He also asserts that he was under the impression that he had no right to object to the relinquishment by the mother.

In the analysis of the claims to equal protection, we first must

ascertain the nature of the right asserted to be entitled to the protection of the U.S. and Nebraska Constitutions. We note that "the relationship between parent and child is constitutionally protected." (Citations omitted.) *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978). However, the status of an unwed father is "readily distinguishable from [that] of a separated or divorced father, and [we] accordingly believe that the State could permissibly give appellant less veto authority than it provides to a married father." *Quilloin, supra* at 256.

We observe that while the language in *Quilloin* and other cases does not use the exact terms which comport with the "strict scrutiny" required of a "fundamental right," we nevertheless apply that test. Obviously, the legislation is not primarily economic or social in nature. *State v. Michalski*, 221 Neb. 380, 377 N.W.2d 510 (1985). However, we also observe that disparate treatment of an unwed father and of an unwed mother in child adoption proceedings is a suspect classification. *Caban v. Mohammed*, 441 U.S. 380, 99 S. Ct. 1760, 60 L. Ed. 2d 297 (1979).

In *State v. Michalski, supra* at 385, 377 N.W.2d at 515, we observed:

> If the legislative classification involves either a suspect class, *Loving v. Virginia*, 388 U.S. 1, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967) (race), or a fundamental right, *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 86 S. Ct. 1079, 16 L. Ed. 2d 169 (1966) (voting), courts will analyze the statute with strict scrutiny. Under this test, strict congruence must exist between the classification and the statute's purpose. The end the legislature seeks to effectuate must be a compelling state interest, and the means employed in the statute must be such that no less restrictive alternative exists.

That the state has a compelling interest in the well-being of all children, whether born in or out of wedlock, and of their proper nurture and care, is accepted. Further, that the transfer of children by relinquishment from unwed mothers and the adoption of those children are also compelling state interests is clear. Given these compelling state interests, what means has the

Legislature adopted to effectuate these interests?

The statutory scheme here requires the father of a child born out of wedlock to declare himself as such within 5 days after the birth of the child and to assume the financial obligations of that status. The Nebraska statutory scheme does not provide for notification to the father of the birth of the child.

That omission might well, in a particular case, render constitutionally suspect as violative of due process the termination of the father's rights. See *Caban v. Mohammed, supra*. However, the facts in this case clearly demonstrate that the appellee father knew of the pregnancy as soon as the condition could be medically verified. He knew the whereabouts of the mother and was advised of the birth on the date of occurrence. Except for conversations relating to the disposition of the child, no manifestation of his intention to assert rights was made known. The record is completely devoid of any financial contribution to the expenses of maintenance during pregnancy or of other medical expenses. The lack of a provision for notice in the statutes does not render the scheme unconstitutional as to the appellee father.

We will therefore discuss only the other asserted deficiency, that of requiring an unwed father to acknowledge paternity within 5 days of the birth.

Fairly obviously, a considerable difference in the treatment of an unwed father and an unwed mother exists in § 43-104.02. The unwed mother is entitled to custody of the child, and, indeed, custody cannot be taken from her absent evidence of unfitness and that the removal is in the best interests of the child. The custody is automatic unless terminated after notice and fair hearing.

The unwed father, on the other hand, has no automatic right to custody: he must acknowledge the paternity within 5 days after birth and must establish paternity in a judicial proceeding. In the event of a proposed relinquishment by the mother, the unwed father must establish that he "is a fit person, is able to properly care for the child, and that the child's best interests will be served by granting custody" in order to successfully contest the proposed relinquishment. § 43-104.06(1).

The section appears to apply only where there is an adoption proceeding after relinquishment by the mother and does not limit the rights of a custodial unwed mother to seek support for the child at any time during the minority of the child.

The Legislature, in the passage of §§ 43-104.02 et seq., was concerned about the problems facing an unwed mother as to the retention of custody of the child or the relinquishment of the child to an agency for placement in an appropriate home. The 5-day period after birth was selected, in the words of the introducer, "primarily because this is pretty much a standard length of time that a child and the mother might be kept in the hospital anyway." Judiciary Committee Hearing, L.B. 224, 84th Leg., 1st Sess. 2 (Jan. 29, 1975) (statement of Sen. Anderson). An unwed mother would then know at the time she is likely to be released from the hospital whether the father will step forward, claim his own flesh and blood, and assume the responsibilities he biologically created. If not, the mother may then make the painful decision alone and not be left in the terrible limbo of growing attachment and love for the child, awaiting either the outcome of a judicial proceeding with its attendant notoriety or the decision of the amorous Hamlet in the wings, pondering whether he should assume his responsibility.

It is further obvious that the Legislature exercised a judgment favoring adoption of children of unwed couples as soon as possible after birth, concluding that the placement of the child in a home with persons anxious to have, love, and rear the child is to be preferred over a battleground where the mother must either depend on social agency support or on the outcome of a judicial support proceeding to compel the father to assume his responsibility.

The Legislature also considered (in view of the extended testimony) the views of the licensed child placement agencies that rapid determination of the rights, if any, of an unwed father to object to a relinquishment and subsequent adoption is in the best interests of the child, the relinquishing mother, and of the prospective adoptive parents. That prospective adoptive parents would assume custody of a newborn with the prospect of later having to surrender the child is questionable. That the

Legislature accomplished those goals with the passage of the act is clear. It is further clear that the problems of unwed births and adoptions are legitimate concerns of the Legislature.

In consideration of the countervailing claims of this appellee father, we must note that, until after the birth, he exhibited (at least financially) no responsibility for the child or the mother. This is not a case where he lived with the child and nurtured and supported it and the mother. Thus, his rights, as Justice Marshall observed in *Quilloin v. Walcott*, 434 U.S. 246, 256, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978), "are readily distinguishable from those of a separated or divorced father, and [we] accordingly believe that the State could permissibly give appellant less veto authority than it provides to a married father."

We are not impressed with the excuse that the appellee father did not know of the 5-day limitation. In this matter he is presumed, as are all citizens, to know the law. Statutes of limitation bar evenly the claims of the wary and the unwary and the just and the unjust.

As we have concluded that the statute as applied is not unconstitutional, the cause is remanded with directions to dismiss the application for writ of habeas corpus.

REVERSED AND REMANDED WITH
DIRECTIONS TO DISMISS.

KRIVOSHA, C.J., dissenting.

I must respectfully dissent from the majority opinion in this case. I do so because, in my view, Neb. Rev. Stat. § 43-104.02 (Reissue 1984) violates both U.S. Const. amend. XIV, § 1, and Neb. Const. art. I, § 3.

While I concede that the cases decided by the U.S. Supreme Court on this issue have not always been consistent, I believe, nevertheless, that a common thread does run throughout the cases. In my view, pulling out that common thread unravels the validity of the statute in question.

The majority opinion argues that the purpose of the act is to facilitate the adoption of children born out of wedlock. In order to facilitate adoptions the act treats fathers of children born out of wedlock differently than mothers. I believe the U.S. Supreme Court, in its various decisions, has held that

objectionable. In *Caban v. Mohammed*, 441 U.S. 380, 99 S. Ct. 1760, 60 L. Ed. 2d 297 (1979), the U.S. Supreme Court, in striking down a New York statute which granted an unwed mother the authority to block the adoption of her child simply by withholding her consent but did not give an unwed father a similar right, said at 388: "Gender-based distinctions 'must serve important governmental objectives and must be substantially related to achievement of those objectives' in order to withstand judicial scrutiny under the Equal Protection Clause." The Court went on further to say at 389: "Contrary to appellees' argument and to the apparent presumption underlying § 111, maternal and paternal roles are not invariably different in importance." The State of New York in *Caban, supra*, as is true in the instant case, argued that this cutting off of rights·was critical in order to assist in bringing about adoptions. In rejecting that argument the U.S. Supreme Court said in *Caban* at 391:

> The State's interest in providing for the well-being of illegitimate children is an important one. We do not question that the best interests of such children often may require their adoption into new families who will give them the stability of a normal, two-parent home. Moreover, adoption will remove the stigma under which illegitimate children suffer. But the unquestioned right of the State to further these desirable ends by legislation is not in itself sufficient to justify the gender-based distinction of § 111. Rather, under the relevant cases applying the Equal Protection Clause it must be shown that the distinction is structured reasonably to further these ends. As we repeated in *Reed v. Reed*, 404 U.S., at 76, such a statutory "classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' [Citation omitted.]"

The *Caban* Court went on to say at 391-92:

> We find that the distinction in § 111 between unmarried mothers and unmarried fathers, as illustrated by this case, does not bear a substantial relation to the State's interest in

providing adoptive homes for its illegitimate children. It may be that, given the opportunity, some unwed fathers would prevent the adoption of their illegitimate children. This impediment to adoption usually is the result of a natural parental interest shared by both genders alike; it is not a manifestation of any profound difference between the affection and concern of mothers and fathers for their children. Neither the State nor the appellees have argued that unwed fathers are more likely to object to the adoption of their children than are unwed mothers; nor is there any self-evident reason why as a class they would be.

Similarly, in *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972), the U.S. Supreme Court declared unconstitutional an Illinois statute under which an unwed father is not included in the statutory definition of "parent" and thus is subject to being deprived of the custody of his illegitimate children by dependency proceedings in which he is not entitled to a hearing as to his fitness as a parent, but, in effect, is presumed to be unfit. In declaring the act unconstitutional the U.S. Supreme Court said in *Stanley, supra* at 656:

> Despite *Bell* and *Carrington*, it may be argued that unmarried fathers are so seldom fit that Illinois need not undergo the administrative inconvenience of inquiry in any case, including Stanley's. The establishment of prompt efficacious procedures to achieve legitimate state ends is a proper state interest worthy of cognizance in constitutional adjudication. But the Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones.

And, further, in *Stanley* at 658 the Court said:

> The State of Illinois assumes custody of the children of married parents, divorced parents, and unmarried

mothers only after a hearing and proof of neglect. The children of unmarried fathers, however, are declared dependent children without a hearing on parental fitness and without proof of neglect. Stanley's claim in the state courts and here is that failure to afford him a hearing on his parental qualifications while extending it to other parents denied him equal protection of the laws. We have concluded that all Illinois parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody. It follows that denying such a hearing to Stanley and those like him while granting it to other Illinois parents is inescapably contrary to the Equal Protection Clause.

While it is true that in the instant case the statute does not automatically deny the father the right to notice and hearing, nevertheless it does seek to accomplish a similar end. The statute requires that the father must, within 5 days after birth, acknowledge paternity in a narrow, limited manner, to wit, by filling out a form provided by the Department of Social Services. The father must also file the form with the Department of Social Services. In my view this statutory scheme unconstitutionally discriminates against the father.

This 5-day filing requirement is, in my view, a denial of equal protection. For a host of reasons, one may intend to acknowledge paternity, pay the hospital bills, hand out cigars, and tell the world of the birth of a child, and yet, unless the individual can find the form specifically prescribed by the Department of Social Services and cause that form to be filed, presumably in Lincoln, within 5 days after birth, if the mother unilaterally chooses to place the child for adoption, the father is forever precluded from making any claim to the child. Moreover, should the unilateral decision to permit adoption to take place occur at some later time, the father is forever barred from receiving any notice or other due process. In the instant case the putative father filed the proper document with the proper agency 9 days after birth. Yet, we forever bar his rights because the filing was 4 days late.

I recognize that attempting to chart a course that will place a marker on an appropriate cutoff date is extremely dangerous.

Nevertheless, I believe that setting a 5-day limit should be recognized by anyone as being too short. We even permit certain buyers of goods 3 days in which to rescind a purchase order. See Neb. Rev. Stat. § 69-1603 (Reissue 1981).

Furthermore, the provisions of § 43-104.02 are wholly inconsistent with other provisions of the law still in full force and effect in Nebraska. Neb. Rev. Stat. § 13-109 (Reissue 1983) provides:

> A person may state in writing that he is the father of a child or perform acts, such as furnishing of support, which reasonably indicate that he considers himself to be the father of such child, and in such case he shall be considered to have acknowledged the paternity of such child.

And Neb. Rev. Stat. § 13-102 (Reissue 1983) provides that the father of a child whose paternity is established either by judicial proceedings or by acknowledgment shall be liable for its support to the same extent and in the same manner as the father of a child born in lawful wedlock is liable for his child's support. The net effect is to say that even though the father may acknowledge in writing that he is in fact the father and thereby remain liable for the child's support, he nevertheless is not entitled to any rights insofar as the adoption of his child is concerned unless he has, within 5 days of the child's birth, made that writing on a form prescribed by the Nebraska Department of Social Services. Even then the inconsistencies do not end. While the father has but 5 days under § 43-104.02 to establish his paternity, the mother has 4 years. See Neb. Rev. Stat. § 13-111 (Reissue 1983). Even though the mother may determine not to relinquish the child for a period of 4 years and even though the father may acknowledge in writing, though not on the proper form, that he is the father, and even though he may provide support, nevertheless if the magic writing has not occurred on the prescribed form and been properly filed within 5 days of birth, all of the mother's rights continue, but the father's rights are terminated.

Even after the father's rights are so quickly terminated, the adoption may not, under Nebraska law, proceed. Before a child may be adopted, the child must reside with the adoptive parents

for at least 6 months. See Neb. Rev. Stat. § 43-109 (Reissue 1984). While, indeed, it can be argued that most adoptive parents who take a child into their home believe that, at the completion of 6 months, the adoption will become final, nevertheless the statute makes no such assurances.

It is difficult to conceive why, if the parties first married and the father then immediately left, a period of 6 months must expire before abandonment can be established, but if the parties failed to marry before the child was born and the father did not leave, after 5 days he could be denied any right.

The act under attack does not require that the father provide any support, either financially or emotionally, in order to acquire rights. All he need do is file a prescribed form within 5 days. That strikes me as being unreasonable.

The majority opinion observes that the appellee father in this case exhibited no financial responsibility for the child or the mother prior to birth. The majority observes:

> This is not a case where he lived with the child and nurtured and supported it and the mother. Thus, his rights, as Justice Marshall observed in *Quilloin v. Walcott*, 434 U.S. 246, 256, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978), "are readily distinguishable from those of a separated or divorced father, and [we] accordingly believe that the State could permissibly give appellant less veto authority than it provides to a married father."

But how can this father, or any father, under § 43-104.02, live with the child, nurture it, and support it if his rights to the child can be terminated during the time that the mother and child are in the hospital and before he is afforded any opportunity to establish those necessary ties?

In my view the provisions of § 43-104.02 do not withstand strict scrutiny. I would have affirmed the decision of the district court which found the act unconstitutional.