IN RE APPLICATION OF S.R.S. AND M.B.S.
S.R.S. AND M.B.S., HUSBAND AND WIFE, APPELLEES, V. M.C.C.,
JR., INTERVENOR-APPELLANT.

408 N.W.2d 272

Filed June 26, 1987.   No. 86-130.

Barbara Thielen of Taylor, Fabian, Thielen & Thielen, for appellant.

A. Loy Todd, Jr., of Bailey, Polsky, Cada, Todd & Cope, for appellees.

James R. Mowbray of Mowbray, Chapin & Walker, P.C., guardian ad litem.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

PER CURIAM.

The appellant in this case is the natural father of a child who was the subject of an adoption proceeding filed in the county court for Lancaster County by the appellees, the adoptive parents. The appellant appeared and contested the adoption. The county court ordered the adoption, holding that the consent of the father was unnecessary. The natural father appealed to the district court for Lancaster County, which affirmed the decision of the county court. He now brings this present appeal, challenging the separate grounds of the decision to allow the adoption to proceed without his consent. He assigns two errors: that Neb. Rev. Stat. §§ 43-104.02 et seq. (Reissue 1984) are unconstitutional on their face and as applied to him and that the court erred in finding that he had abandoned his son during the 6 months prior to the filing of the adoption proceeding. We reverse.

Prior to the birth of the child who is the subject of the action, the appellant and the natural mother lived together, and planned to marry before the child was conceived. However, she decided not to marry, preferring to remain single.

The child was born on September 2, 1982. The appellant's name appears on the birth certificate as the father of the child, and on September 3, 1982, the parties signed an agreement providing that the child would bear the appellant's last name.

After leaving the hospital the couple and their child lived together for approximately 19 months. They first lived with the birth mother's sister, the sister's husband, and their child. Under the financial arrangement between the two families, each was to pay half of the expenses. The mother testified that the appellant was employed at this time and that she was not. He provided for their support. After 3 months the three moved to the paternal grandmother's home, where they were obligated to pay $200 per month for rent and do household chores. In May of 1983, the appellant, birth mother, and child moved to the home of another of the mother's sisters, the sister's husband, and two children. Each family was to pay half of the expenses. Again,

the appellant was employed and supporting the child. At this time the mother started looking for work. She admitted that the appellant also helped out with the care of the child. After about a month the mother and her sister secured jobs. Since all four adults were employed, child care became difficult. Eventually, the appellant, mother, and child moved in with a friend who worked with the mother and worked the shift opposite that of the mother's. The two women paid the rent, while the appellant provided for the groceries. This arrangement lasted 3 months, until January 1984, when the friend moved out. The appellant, child, and the mother remained at the apartment until April 9, 1984, at which time the mother took the child and moved into the friend's new apartment for a month. The appellant attempted unsuccessfully to reconcile with the mother. He remained in the old apartment until the lease expired at the end of October of 1984.

During the month the mother lived with her friend, she was unemployed. For 10 days of this month the child stayed with the paternal grandmother, and the appellant visited him. When the mother returned and took the child after 10 days, a conflict arose between her and the paternal grandmother over custody of the child.

On June 10, 1984, the mother and child moved in with the mother's boyfriend. No one knew the address except possibly her mother, who was asked not to reveal it. Over the next couple of months the mother left the child with various relatives, including the paternal grandmother, the maternal grandmother, a brother of the mother (hereinafter "the uncle"), and another sister of the mother (hereinafter "the aunt"). The mother's family helped provide the father with information about the child's whereabouts. The appellant saw his child at the paternal grandmother's home on several weekends in June and July and on other occasions when the child was staying with the mother's family. He provided money, diapers, and medication for the child while the child was staying with the mother's family, and offered additional financial help which was not accepted. In addition to visits, the appellant took the child to his apartment for short periods and called the others inquiring about his son at other times. The maternal

grandmother, uncle, and aunt testified about the relationship between the appellant and his child, including how he made his child giggle and laugh as they played.

On June 29 the paternal grandmother instituted proceedings to have herself appointed guardian of the child. Her attorney also drafted consent forms for the mother and appellant. The attorney testified that these forms were drafted in accordance with the guardianship statutes. The mother testified that she saw a form signed by appellant. He denied he had signed, and testified he would have signed only if she had. The mother had been willing to sign, but refused to do so on advice from her boyfriend and her attorney. In July, the mother considered adoption. The appellant testified he called Legal Aid for help in getting custody of his son, but was informed he could not get legal custody unless the mother instituted a paternity action against him. The mother testified that in August she was aware the appellant wanted to get custody of his son.

In August, the mother, the boyfriend, and the child moved to an apartment which was within a mile of the appellant's apartment. The mother decided she did not want the appellant to see his son again. The maternal grandmother testified that she did not know the address of the apartment, but knew where her daughter lived because she had visited the apartment. She also testified that her daughter asked her not to reveal where she lived and that the boyfriend had threatened to kill the father, uncle, or paternal grandmother if they attempted to visit the apartment. The mother denied there were any threats, but testified there was a conversation among the three during which her mother disowned her. The mother testified that on one occasion she heard the appellant and the uncle were going to try to get the child, and she told her mother to tell them the house was being watched by the police. However, the appellant did see the child at least once during that period.

On September 28 the mother placed the child with the Child Saving Institute for adoption. The child was with a foster family until October 3, when he was placed with the adoptive parents, the appellees in this action. The mother did not tell the appellant about the adoption.

During the next few months the father contacted the

mother's family several times trying to get information about the child. They did not know where the child was. The maternal grandmother testified that she visited the mother's apartment several times, but the mother and her boyfriend would turn off the television, close the blinds, and refuse to answer the door. The maternal grandmother testified that her daughter finally told her about the adoption in the first part of February 1985. She told her son (the uncle) about it. The uncle testified that he immediately called the appellant upon learning about the adoption. The appellant testified he learned about the adoption on January 29, 1985. He subsequently called the Child Saving Institute. A social worker at the Child Saving Institute testified that she talked to the appellant on February 13, 1985. He asked that the child be returned to him, but was told the child had been placed for adoption.

The appellant obtained an attorney to help him. On March 1, 1985, the appellant filed an intent to claim paternity. The father testified that he never consented to the adoption, he never intended to relinquish his parental rights, and he wanted custody of his son. On March 27 the appellees filed a petition for adoption. They then filed an amended petition and a second amended petition on April 25 and May 7, respectively.

The adoptive father is a stockbroker; the adoptive mother is a homemaker. They have another adopted child. At the time of the hearing it appeared that the child had adjusted well to his new family.

The trial court held that the appellant's consent was not necessary for the adoption to proceed because clear and convincing evidence was adduced showing that the appellant had abandoned his child and his parental rights.

Neb. Rev. Stat. § 43-104 (Reissue 1984) provides:

No adoption shall be decreed unless the petition therefor is accompanied by written consents thereto executed by (1) the minor child, if over fourteen years of age, or the adult child of the adopting person's spouse, (2) any district court or separate juvenile court in the State of Nebraska having jurisdiction of the custody of a minor child by virtue of divorce proceedings had in any district court or separate juvenile court in the State of Nebraska,

and (3) both parents, if living; the surviving parent of a child born in lawful wedlock; or, subject to the provisions of sections 43-104.02 to 43-104.06, the mother of a child born out of wedlock; *except that consent shall not be required of any parent who shall* (a) have relinquished the child for adoption by a written instrument; (b) *have abandoned the child for at least six months next preceding the filing of the adoption petition*; (c) have been deprived of his or her parental rights to such child by the order of any court of competent jurisdiction, or prior to July 13, 1967, have been deprived of the custody of such child by an order of any juvenile court of competent jurisdiction by reason of such child having been declared a dependent or neglected child, within the provisions of sections 43-201 to 43-277; or (d) be incapable of consenting.

(Emphasis supplied.) Under the terms of the statute, the time period within which abandonment must be shown is the 6-month period immediately prior to the filing of the adoption petition by the appellees. § 43-104(3)(b); *In re Adoption of Simonton*, 211 Neb. 777, 320 N.W.2d 449 (1982). In this case the critical time period is from September 27, 1984, to March 27, 1985, which is the date the petition was filed. The child was placed with the Child Saving Institute on September 28, 1984.

In *In re Adoption of Simonton, supra*, this court defined the word "abandoned," when used in the context of adoption proceedings, as follows:

" 'To constitute abandonment under our code it must appear . . . that there has been by the parents a giving-up or total desertion of the minor child. In other words, there must be shown an absolute relinquishment of the custody and control of the minor and thus the laying aside by the parents of all care for it.' " *In re Adoption of Christofferson*, 89 S.D. 287, 290, 232 N.W.2d 832, 834 (1975). North Carolina requires that there be "willful or intentional conduct on the part of the . . . parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child, or a willful neglect and refusal to perform the natural and legal obligations of parental care and support." *In re Cardo*, 41

N.C. App. 503, 507, 255 S.E.2d 440, 442 (1979).

Willful abandonment has been defined as "a voluntary and intentional relinquishment of the custody of the child to another, with the intent to *never again* claim the rights of a parent or perform the duty of a parent; or, second, an intentional withholding from the child, without just cause or excuse, by the parent, of his presence, his care, his love and his protection, maintenance, and the opportunity for the display of filial affection . . . ." *Young v. Young*, 588 S.W.2d 207, 209 (Mo. App. 1979).

(Emphasis in original.) 211 Neb. at 782-83, 320 N.W.2d at 453. Abandonment must be proven by clear and convincing evidence. *Id.; In re Guardianship of Sain*, 211 Neb. 508, 319 N.W.2d 100 (1982). The burden of proving abandonment is on the party petitioning for adoption. *In re Adoption of Simonton, supra.*

The conduct constituting abandonment as defined above must appear by clear and convincing evidence to be willful, intentional, or voluntary, without just cause or excuse. For all but 1 day of the 6-month period before the filing of the petition, the child was in foster care with the Child Saving Institute or the prospective adoptive parents, and beyond the reach or control of the appellant. The appellant's attempts to locate the child were thwarted by the mother's resolution to keep him from the child. She did not inform anyone about placing the child for adoption until late January or early February of 1985, after the child had been placed for over 3 months. When the appellant learned of the placement he called the Child Saving Institute. There is no question that the appellant asked that the child be returned to him and that the institute would not have surrendered the child to the appellant at any time, nor would it inform the appellant of the location of the child. A secret surrender of a child by one parent to an agency that refuses to let the other parent act as a parent to the child cannot result in a finding that the failure to exercise parental duties was willful, intentional, or voluntary.

Parental conduct before or after the statutory time period is relevant to a determination of the purpose and intent of the parent to abandon his child. *In re Adoption of Simonton,*

*supra.* The appellant filed a notice of intent to claim paternity on March 1, 1985, just before the appellees filed their adoption petition. The mother testified that the month before she placed the child with Child Saving Institute she was aware that the appellant was attempting to get physical custody of the child and took steps to keep the child from him. The appellant acknowledged the child as his son at birth. During the 19 months when the appellant lived with the mother and child he actively supported and cared for them. The relatives who cared for the child when the mother would drop him off testified that the appellant visited the child and engaged in playful behavior with him.

Although the appellant did not offer much in the way of support to the mother after she moved out, he did provide medicine and diapers when the child was staying at relatives' houses. He visited the child and took him overnight at least once despite the mother's attempts to part them.

We cannot find that the evidence shows an intentional and complete repudiation and abandonment of the child or a settled purpose to forgo all parental rights. Although the appellant has not been the most constant of fathers, there is no evidence of an unequivocal repudiation of his relationship with his child. Instead, the evidence shows his intent to get custody and take legal steps to claim paternity before the petition was filed and to maintain a relationship with his child over the obstacles between them. We hold that the appellees failed to meet their burden of proof with respect to showing abandonment by the appellant within the meaning of § 43-104(3)(b).

Although the trial court held that the appellant's consent was unnecessary because he had abandoned the child, it nevertheless stated in its decree that "the court is under the belief that no consent of [the appellant] is necessary, because of his failure to comply with [§§ 43-104.02 et seq.]." The court specifically found that the appellant "failed to comply with Sec. 43-104.02, et seq., in that his filing was made some 2-1/2 years late and [the court] refuses to find that said statute is unconstitutional as applied to this individual."

Section 43-104.02 provides in part as follows:

(1) Relinquishment or consent for the purpose of

adoption given only by a mother of a child born out of wedlock pursuant to section 43-104 shall be sufficient to place the child for adoption and the rights of any alleged father shall not be recognized thereafter in any court unless the person claiming to be the father of the child has filed with the Department of Social Services on forms provided by the department, within five days after the birth of such child, a notice of intent to claim paternity.

The child was born out of wedlock. The appellant failed to file with the Department of Social Services within 5 days after the child's birth. He did not file until $2^1/_2$ years had passed. The appellees argue that these facts allow the adoption to proceed without the appellant's consent under § 43-104.02. The appellant argues that the statute is unconstitutional on its face and as applied to him.

In *State v. Metteer*, 203 Neb. 515, 521-22, 279 N.W.2d 374, 378 (1979), we stated that "[t]here is no doubt that among the fundamental rights retained by the people under Article IX of the Bill of Rights of the Constitution of the United States is that of integrity of the family." In *Shoecraft v. Catholic Social Servs. Bureau*, 222 Neb. 574, 577, 385 N.W.2d 448, 451 (1986), we noted that " 'the relationship between parent and child is constitutionally protected.' " Quoting *Quilloin v. Walcott*, 434 U.S. 246, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978). Since the right involved is fundamental in nature, the statute interfering with that right is subject to strict scrutiny. *Shoecraft, supra.*

The constitutionality of the statute involved in this case was attacked in *Shoecraft, supra*, where we determined that the statute, as applied in that case, was constitutional. In *Shoecraft* we recognized that the state has a compelling interest in the well-being of all children and the placement of children relinquished by their parents in homes with people willing and able to care for them. Rapid placement of newborns as soon as possible after birth with prospective adoptive parents was noted to be in the best interests of the child, the adoptive parents, and the parent making the difficult decision to relinquish the child. The 5-day filing requirement, although treating mothers and fathers differently, enabled a speedy determination of the rights of the father so as to make it possible for the state to achieve a

legitimate end, which is placement of children as soon after birth as possible.

*Shoecraft* was "not a case where [the father] lived with the child and nurtured and supported it and the mother," 222 Neb. at 580, 385 N.W.2d at 452, and on that ground we distinguished the rights of the father in *Shoecraft* from the rights of separated or divorced fathers, using the rationale established in *Quilloin v. Walcott, supra.*

The father in *Shoecraft* was aware of the impending adoption for 3½ to 4 months prior to the birth. Until 9 days after the birth the father never exhibited any responsibility for the mother or child. At that point, the only tie between the child and father was biological.

In *Lehr v. Robertson*, 463 U.S. 248, 261, 103 S. Ct. 2985, 77 L. Ed. 2d 614 (1983), the U.S. Supreme Court stated that "the mere existence of a biological link does not merit equivalent constitutional protection." The Court recognized the importance of familial bonds, stressing that "[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,' [citation omitted] his interest in personal contact with his child acquires substantial protection . . . ." 463 U.S. at 261.

That the facts and situation in this case differ dramatically from those in the *Shoecraft* case is readily apparent. In this case the rights of the appellant are not so easily distinguishable from those of the mother or of separated or divorced fathers. The appellant provided for and had daily contact with his child for the first 19 of the 24 months of the child's life, before the mother placed the child with the Child Saving Institute. Like that of a divorced or separated noncustodial parent, the appellant's contact with the child was diminished as a result of a rift between him and the custodial parent, not due to an aversion to parental responsibilities.

We found in *Shoecraft* the 5-day filing requirement for unwed fathers to be a legitimate means of attaining a worthy end, the rapid placement of newborns in families that could commit to raising them. However, the 5-day requirement secures no such result in cases such as this one, where the child is

no longer a newborn and has already established strong ties with a father who has acknowledged and supported him. The effect of the requirement is to allow a mother to singlehandedly sever a relationship between father and child, no matter what the quality of that relationship is.

In this case the appellant had a familial bond with the child which afforded his rights substantial protection. All witnesses agreed he lived with the child and provided for it; the mother testified he was involved with the care of the child; the relatives described his playing well with and being close to the child. The mother's friend described an incident months after the parents' breakup, just before relinquishment, in which the child rapped on a window and called "Daddy, Daddy" as the appellant was walking by the house. A parental interest as fundamental as the one the appellant has in the continuing relationship with his child requires that the 5-day rule be strictly scrutinized. We observe no compelling interest that the State secures by allowing a 2-year relationship to be severed for failure to file within 5 days of birth that justifies the disparate treatment of the appellant from those similarly situated on the grounds of gender and marital status. Section 43-104.02 is unconstitutional as applied in this case and cannot be used to allow the adoption to proceed without the appellant's consent.

In *Caban v. Mohammed*, 441 U.S. 380, 99 S. Ct. 1760, 60 L. Ed. 2d 297 (1979), the U.S. Supreme Court struck as violative of equal protection a New York law that allowed an adoption to proceed without the consent of an unwed father who had a substantial relationship with the child involved. Justice Stevens commented in his dissenting opinion that "as I read the Court's opinion, the statutes now in effect may be enforced as usual unless 'the adoption of an older child is sought,' *ante*, at 392, and 'the father has established a substantial relationship with the child and [is willing to admit] his paternity.' *Ante*, at 393." 441 U.S. at 416. We reaffirm our holding in *Shoecraft v. Catholic Social Servs. Bureau*, 222 Neb. 574, 385 N.W.2d 448 (1986), that § 43-104.02 does have possible constitutional applications. However, the statute was unconstitutionally applied in this case.

REVERSED.

KRIVOSHA, C.J., concurring in the result.

While I concur in the result reached by the majority in this case, I write separately because I do not believe the court's view of our earlier decision in *Shoecraft v. Catholic Social Servs. Bureau*, 222 Neb. 574, 385 N.W.2d 448 (1986), is correct, or that the distinction sought to be made by the majority can properly be sustained. Little purpose will be served in repeating at length my dissent in *Shoecraft, supra*. I have difficulty, however, agreeing that a father who files the form required by Neb. Rev. Stat. §§ 43-104.02 to 43-104.04 (Reissue 1984) within 9 days of the birth of a child is out of time, while one who files such a form nearly 30 months later is in time.

To have the constitutionality of a law such as this depend in each instance upon the facts determined after the fact is to fly in the very face of the act's purpose. No adoptive parent can now know with certainty whether the facts underlying the relationship between the natural father and the adoptive child are such as to render the provisions of §§ 43-104.02 to 43-104.04 constitutional or unconstitutional until after the facts have been examined by a court. Furthermore, this court has now ruled, in effect, that if the child is removed from the natural mother while in the hospital, thereby making it impossible for the natural father to establish a relationship with the child, the act will be held constitutional; but, if the natural mother delays placing the child out for adoption so that the natural father has the opportunity to develop a relationship with the child, the act will be declared unconstitutional. Such a holding is not, in my view, based upon any sound legal principles. Such uncertainty is bound to create much distress, as evidenced by the instant case. The scenario which I feared our decision in *Shoecraft* would ultimately bring about has, in my view, come to pass in the instant case, and will continue to repeat itself in future cases.

It was my view in *Shoecraft* that the provisions of §§ 43-104.02 to 43-104.04 were unconstitutional and inapplicable, and it remains my view that such is the case. I would resolve this matter by overruling our decision in *Shoecraft* and declaring the act unconstitutional in all cases.