DOROTHY ANN CLARK, APPELLANT, V. PAUL MELVILLE CLARK,
APPELLEE.

371 N.W.2d 749

Filed August 16, 1985.   No. 84-859.

Paul Korslund of Everson, Noble, Wullschleger, Sutter, Sharp, Korslund & Willet, for appellant.

Jerald W. Kerl of Andersen & Kerl, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

GRANT, J.

Dorothy Ann Clark, petitioner-appellant, filed her petition in Gage County, Nebraska, against Paul Melville Clark, respondent-appellee, seeking dissolution of the marriage of the parties. The parties stipulated to an agreed property settlement disposing of all issues between the parties except the issue as to custody of their minor child. After trial of the action, the court

dissolved the marriage, approved the property settlement, and gave custody of the parties' minor child to the appellee husband, subject to reasonable visitation by appellant wife, including every other weekend and at least 1 month in the summer. The wife appeals, alleging that the trial court erred in permitting a psychiatrist to give an opinion based on the records of another psychiatrist whose practice he purchased, in failing to give proper weight to the opinion of a clinical psychologist, and in finding that "the weight of the evidence sustained the granting of legal and physical custody of the minor child to the Appellee." For the reasons hereinafter set out we affirm.

The evidence showed the parties were married in Oregon on August 6, 1972. The parties had one child, Robert, who was born on November 15, 1975. The petition for divorce was filed on March 7, 1984. At the time of trial in September of 1984, Mrs. Clark was 33 years old, Mr. Clark 35, and the child 8. Mrs. Clark had a bachelor of science degree in secondary education in the field of health and physical education and had taught school, either full time or part time, for 5 years. Mr. Clark is a farmer who rents and operates his father's farm near Lewiston, Nebraska.

After their marriage the parties lived in Oregon for 2 years and then moved to the farm near Lewiston. The farmhouse in which they lived was small and needed repairs. Their child was born while the parties lived there. The record shows that Mrs. Clark did not like the isolated life on the farm. In August of 1979 she was continually crying and was hospitalized for depression and exhaustion, under the care of Dr. Burlingame. In October of 1979 she was again hospitalized for the same reasons. Mrs. Clark continued under Dr. Burlingame's care through the summer of 1981, when she took herself off the prescribed medication and stopped her treatment. In February of 1982 Mrs. Clark was again hospitalized because of continued crying, and again was treated with antidepressant medication. She left the hospital without being released by the doctor and refused to go to seek a different doctor in Omaha, as had been agreed among Dr. Burlingame, Mrs. Clark, and Mr. Clark.

At this point Mr. Clark filed a dissolution action. After 3 weeks Mrs. Clark returned to the farm home, where she lived

with her husband and their child until May 31, 1982. On that day Mrs. Clark drove to the Lincoln airport, left the car there, and took a plane to Aspen, Colorado. On July 4 Mr. Clark took the child to Aspen to see Mrs. Clark, delivered her car to her, and gave her money and clothing. In August the husband again took the child to see her before school started. The child remained with his father at the farm until March of 1983.

Mrs. Clark moved back to Lincoln in September of 1982, where she lived until the parties and Robert moved to an apartment in Beatrice in March of 1983. Mr. Clark dismissed his then-pending divorce action in the same month, and the parties attempted further reconciliation efforts.

After Christmas in 1983 the husband sought psychiatric help by seeing Dr. Tatay for his depression. He continued seeing Dr. Tatay weekly in February and March of 1984. In March of 1984 the parties had a physical confrontation. The husband struck his wife and left the apartment. On March 7, 1984, Mrs. Clark filed her petition for dissolution of the marriage.

Without belaboring the facts further, the situation may be summed up by saying that the case concerns two persons in an unfortunate marriage, where the wife cannot cope with living on the farm and the husband cannot cope with living in an apartment in the city and traveling to the farm. In the middle is their child.

Turning to the first of the wife's assignments of error, the record shows, as stated above, that Mr. Clark began seeing Dr. Tatay regularly in February of 1984. After he began his treatment of Mr. Clark, Dr. Tatay asked to talk with Mrs. Clark to discuss the marital problem that existed between his patient, the husband, and the wife. At his only conference with Mrs. Clark, which took place on February 15, 1984, Dr. Tatay told her "that I had a record of her from the previous physicians since I bought [Dr. Burlingame's] records and his practice . . . ." Dr. Tatay and Mrs. Clark looked at the records together and discussed them. At the trial Dr. Tatay testified "it was not my intent to examine her at that time." Nor did he attempt to treat her. With this background Dr. Tatay testified at the trial of the case 7 months later as to his "impression" of Mrs. Clark. When asked if he had "a medically certain opinion of what her

problems were," Dr. Tatay testified, over objection as to the physician-client privilege and as to foundation, that Mrs. Clark was "suffering from a psychiatric disorder. I could not be more specific than give a couple of possible diagnoses of a psychiatric disorder, a borderline disorder, or a personality disorder."

Mrs. Clark's objection to his opinion was overruled by the trial court, relying on the fact that she had placed her mental condition in issue as an element of her request for custody of her child. This waiver of the physician-patient privilege is set out in Neb. Rev. Stat. § 27-504(4)(c) (Reissue 1979). While we agree generally with the court's ruling, there are certain preliminary matters that must be first discussed.

Initially, we note that there may be some misconception about the implications that flow from Dr. Tatay's belief that when he purchased Dr. Burlingame's practice, he also purchased his records. Because they are neither briefed nor argued, we do not resolve the questions of whether a vendor doctor can, without the consent of the patient, sell patient records at all or whether the vendee doctor acquires such records subject to the privilege existing between the patient and the vendor doctor. We do hold, however, that that purchase of a medical practice by another physician does not in any way affect the confidential physician-patient privilege that exists between the patient and the vendor physician. The privilege continues to exist between the patient and the vendor physician. In 97 C.J.S. *Witnesses* § 252 at 741 (1957) it is stated: "The privilege does not terminate with the cessation of the protected relationship, but continues thereafter." Indeed, in *Boggess v. Aetna Life Ins. Co.*, 128 Ga. App. 190, 191, 196 S.E.2d 172, 174 (1973), the court held that the privilege continues even after the patient dies, stating: "Communications between psychiatrist and patient are of course privileged. . . . Nor does the privilege cease with the death of the client." The privilege protects the communications and the confidences that exist between the psychiatrist and his patient, and it continues to exist.

In the instant case, however, the record shows that during the conversation between Dr. Tatay and Mrs. Clark, she did not claim any privilege as to Dr. Burlingame's records, and

specifically waived any privilege by going through the files with Dr. Tatay. It should be noted that at the time of this conference Mrs. Clark had not yet filed her petition seeking custody, and her actions at the time of the conference were the waiver of her privilege that permitted Dr. Tatay to examine the records. As to the confidential relationship, if any, between Dr. Tatay and Mrs. Clark, she has waived any privilege she had in her conversations with Dr. Tatay by the filing of her petition alleging her fitness to have custody of her child.

As we have stated, we agree with the trial court that by placing her fitness to have custody of her child in issue, Mrs. Clark did waive any physician-patient privilege that existed between herself and Dr. Burlingame and between herself and Dr. Tatay. However, in view of the personal and confidential communications made between a patient and a psychiatrist (see *Taylor v. United States,* 222 F.2d 398, 401 (D.C. Cir. 1955), " 'The psychiatric patient confides more utterly than anyone else in the world . . .' "), when a litigant seeks custody of a child in a dissolution of marriage proceeding, that action does not result in making relevant the information contained in the file cabinets of every psychiatrist who has ever treated the litigant. The determination as to the admissibility of the evidence to which the waiver applies is to be initially entrusted to the sound discretion of the trial court. In this case the trial court did not abuse its discretion, and Dr. Tatay was properly permitted to testify as to his opinion as to Mrs. Clark's mental condition, insofar as considerations of the physician-patient privilege and the waiver thereof.

Mrs. Clark's other objection to Dr. Tatay's opinion is that the psychiatrist had no proper foundation for his opinion because it was based in part on the examination of medical records prepared by another doctor. Neb. Rev. Stat. § 27-703 (Reissue 1979), however, provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in

evidence.

Here, the facts relied on by Dr. Tatay were the records of the previously treating doctor (Dr. Burlingame), and since those records were the earlier records of treatment of Mrs. Clark, the records were "of a type reasonably relied upon by experts in the particular field." As stated in *Com. v. Gilliard*, 300 Pa. Super. 469, 446 A.2d 951, 954 (1982): "A medical witness may express opinion testimony in medical matters based, in part, on reports of others which are not in evidence but upon which the expert customarily relies in the practice of his profession." The objection to Dr. Tatay's opinion as lacking proper foundation was properly overruled.

We turn, then, to consideration of what weight should be given to Dr. Tatay's opinion. We note that in the trial court's decree of dissolution, the court specifically mentioned the testimony of Dr. Tatay insofar as that testimony concerned his opinions as to the mental condition of his patient, Mr. Clark. The trial court makes only passing reference to Dr. Tatay's "conference" with Mrs. Clark, and that fact, we believe, indicates that the court gave little weight to such testimony. In our independent review we reach the same conclusion. Dr. Tatay's opinion as to Mrs. Clark's mental state was not rendered after examination or treatment, but was the result of a "conversation" directed at other matters—the treatment of Mr. Clark. We note also that Dr. Tatay gave a general "impression" without specific psychiatric details and that he admitted he had no "medically certain" opinion as to Mrs. Clark's ability to care for her son—one of the issues before the court. In our decision herein, the opinion of Dr. Tatay as to Mrs. Clark's mental condition will be given little weight.

With regard to the wife's second assignment of error—that the trial court failed "to give proper weight to the opinion of Dr. Price, a clinical psychologist"—we refer to our standard of review of this case as set out below. By agreement of the parties, Dr. Price interviewed both parties, and his report as to his examination of each was placed in evidence by stipulation. The essence of the two reports is that both parties are decent people, that both have some problems, but that both are handling their problems fairly well. All Dr. Price's reports do is to support the

findings of the trial court, which determined, as we do in our independent review, that both parties are fit and proper persons to have custody of the child. There was no error in this regard.

Mrs. Clark's third assignment of error is that the court erred in giving custody to the husband. In reviewing the award of custody of children in a dissolution of marriage case, our determination in this court is governed by similar rulings in such cases in dividing property and awarding attorney fees (*Guggenmos v. Guggenmos*, 218 Neb. 746, 359 N.W.2d 87 (1984)); in determining alimony awards (*Ford v. Ford*, 219 Neb. 13, 360 N.W.2d 495 (1985)); and in determining the amount of child support (*Lainson v. Lainson*, 219 Neb. 170, 362 N.W.2d 53 (1985)). In our review of initial child custody decisions in a dissolution of marriage case, we hold that determinations as to the custody of children are matters initially entrusted to the sound discretion of the trial judge, which matters, on appeal, will be reviewed de novo on the record and affirmed in the absence of an abuse of the trial judge's discretion, keeping in mind, however, that this court will give weight to the fact that the trial judge observed and heard the witnesses and accepted one version of the facts rather than the other. See, *Koch v. Koch*, 209 Neb. 896, 312 N.W.2d 294 (1981); *Parsons v. Parsons*, 219 Neb. 736, 365 N.W.2d 841 (1985); *Chalupa v. Chalupa, ante* p. 704, 371 N.W.2d 706 (1985).

We have long held that in deciding the question of who should have the care and custody of a child upon the dissolution of a marriage, the paramount consideration must be the best interests and welfare of the child. *Schmer v. Schmer*, 211 Neb. 414, 318 N.W.2d 876 (1982); *Moeller v. Moeller*, 215 Neb. 360, 338 N.W.2d 749 (1983). We agree with the trial court's decision. We, too, find that the husband has exhibited a more stable lifestyle and will offer a more stable environment for the child. The fact that the wife left the child from May to September in 1982 while she resided in Aspen, Colorado, and from September 1982 to March 1983 while she lived in Lincoln is disturbing. However valid her reasons, the fact remains that the husband had sole responsibility for the child during that period. As to other matters, such as whether the child preferred to be in the city or on the farm, which are disputed questions of fact, we

note the trial court observed and heard the witnesses. While both parents are fit, we find the court did not abuse its discretion when determining that Mr. Clark should have custody, with the liberal visitation determined by the trial court. The decision of the trial court is affirmed.

AFFIRMED.