VALERIE A. PETERSON, APPELLEE, V. RAYMOND D. PETERSON, APPELLANT, NORDON WOOLLEN AND MARY ANN WOOLLEN, HUSBAND AND WIFE, INTERVENORS-APPELLEES.

399 N.W.2d 792

Filed January 23, 1987.   No. 85-777.

Greg C. Harris, for appellant.

Marmion F. Yeagley of State, Yeagley & George, for intervenors-appellees.

No appearance for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

PER CURIAM.

In October 1984 Valerie A. Peterson filed for a dissolution of her marriage with Raymond D. Peterson and prayed that the court award her custody of the couple's 6-year-old son, Brooke. Raymond Peterson, as the respondent and cross-petitioner, alleged that Valerie was unfit to have custody of Brooke due to her mental illness and asked for custody of Brooke. The child's maternal grandparents, Nordon and Mary Ann Woollen, who had physical custody of Brooke, intervened in the proceedings without objection, alleged that Raymond Peterson was unfit for custody of Brooke, and asked that custody of Brooke be placed with the grandparents.

Trial was held on August 5, 1985, and evidence was presented to the district court on the fitness of the parties for custody of the minor child, Brooke.

Evidence presented by the wife, Valerie Peterson, described the physical violence inflicted on her by her husband, Raymond. At least once a week Raymond would clench his fists and beat Valerie about her face and head, leaving bruises and causing bleeding. Such physical abuse was corroborated by a member of the wife's church. Also, Mary Ann Woollen, the

wife's mother, testified that on several occasions during the marriage she observed Valerie Peterson's bruised face, swollen nose, and black eyes. Valerie Peterson testified that physical abuse was caused by Raymond Peterson's drinking problem.

Raymond Peterson admitted that he had been convicted of drunk driving in Colorado approximately 1 year prior to the dissolution proceedings. However, he denied that he had any drinking problem. In his testimony, Raymond Peterson admitted that he struck his wife. His reason for striking his wife was her religious practices. As testified by the husband, Valerie Peterson would awaken during the night, claiming to hear voices of people talking to her. Almost every day the wife would pray in the closet with the door closed and lights off, and anointed Brooke and herself with olive oil. Valerie Peterson would also write religious sayings in crayon on the walls of the couple's house.

There was evidence that Valerie suffered from a form of schizophrenia which required hospitalization in 1980. At the time of trial, Valerie Peterson was taking prescription medication for her mental condition. Raymond Peterson testified that his wife persisted in her religious practices, aforementioned, both when she did not take her prescriptions and notwithstanding the medications.

The grandparents, as intervenors, offered evidence of a therapist specially trained in drug and alcohol abuse counseling. The therapist had interviewed Raymond Peterson as the result of Raymond's Colorado drunk driving conviction. The therapist testified that Raymond Peterson suffered from blackouts, morning trembling, job difficulties including missing work, and marital problems, and was inclined to physically abuse his wife. The therapist further testified that tests indicated that Raymond Peterson was a "serious problem drinker."

Raymond Peterson testified about his work history. Peterson testified that he only worked about half the time during which he and Valerie were married and that his present employment would provide support for Brooke. Raymond Peterson's employment included two jobs, one a well-drilling job which required 50 to 60 hours per week and the other being a

deliveryman for a courier service. The well-drilling job sometimes required that Raymond Peterson work until 8 p.m. The courier job required that Raymond Peterson be away from home from noon on Friday through late morning on Saturday. However, Raymond Peterson testified that he could make arrangements with a child care facility and certain relatives for the care of Brooke when Raymond Peterson was not at home.

Evidence on behalf of the grandparents, Nordon and Mary Ann Woollen, indicated that Brooke had spent a substantial amount of time with his grandparents on their farm near Wilcox, Nebraska. Brooke had lived with his grandparents for 6 months during his mother's illness and hospitalization in 1980. At the time of the dissolution proceedings, Valerie Peterson and Brooke had been living with the Woollens since June of 1984, when Raymond Peterson left to work in Colorado. Mary Ann Woollen estimated that Brooke had spent approximately 2 of his 6 years with his grandparents. Mary Ann Woollen also testified that the Woollens have provided support for Raymond, Valerie, and Brooke by paying grocery, clothing, medical, and utility bills over a period of time from February 1979 to April 1983.

Further testimony offered by the Woollens showed that Nordon, age 58, and Mary Ann, age 52, were in good health and financially able to provide for Brooke. Nordon Woollen testified that he takes Brooke with him to check livestock and to do the irrigating, and also plays ball with Brooke. The entire family, including Brooke and his mother, attend church regularly. During the school year preceding the dissolution proceedings, Brooke had been enrolled in kindergarten in the Wilcox public schools and had done well academically, according to the testimony of Mary Ann Woollen, who had attended parent-teacher conferences for Brooke. Mary Ann Woollen also testified that she takes care of Brooke, bathes him, plays with him, does his laundry, sees to it that he gets to school, makes certain Valerie takes her medication, and never leaves Brooke alone with Valerie.

To prove that it was in Brooke's best interests to be in the custody of his grandparents, the Woollens offered the testimony of two experts. Dr. Charles Eigenberg conducted a

family evaluation of the Woollens, Valerie, and Brooke approximately 1 month prior to the dissolution proceedings. Dr. Eigenberg observed a "very good solid attachment" between Brooke and his grandparents, and further noted that Brooke "[s]eemed to be well adjusted" to the living situation involving his grandparents. Upon further evaluation and testing, Dr. Eigenberg concluded that in his opinion it would be detrimental to Brooke to break the bond with the Woollens, as Brooke views the Woollens as parents rather than grandparents. Dr. Eigenberg also expressed his opinion in regard to the danger of Valerie's being in the same home with Brooke, and concluded that he foresaw no risk of harm as long as the medication is controlled and adequately supervised. Dr. Eigenberg concluded it would be in Brooke's best interests to stay with his grandparents. Dr. Gerald Daly, a psychologist, generally agreed with Dr. Eigenberg. Dr. Daly had interviewed Brooke, his mother, and his grandparents. Based upon this interview, Dr. Daly expressed his opinion that Mary Ann Woollen has become Brooke's primary caregiver, in that she is the person Brooke turns to for comfort and depends on in stressful situations.

In response to the evidence proffered by the Woollens, Raymond offered the testimony of Dr. Ernest Matuschka, a clinical psychologist, whose practice includes family therapy and the treatment and rehabilitation of alcoholics. Dr. Matuschka testified that, in his opinion, Brooke could not be safe at home with Valerie for the reason that many schizophrenics outside the hospital setting do not stay on medication, as the disease affects their thought processes, and that even while on medication they may be dangerous to others. In regard to Raymond Peterson's drinking problem, Dr. Matuschka defined Raymond Peterson as a "reactive problem drinker" since age 16. Dr. Matuschka described this type of problem drinking as stress-induced and one that can occur again and, thus, would require professional help for Raymond Peterson. Although Dr. Matuschka noted that returning Brooke to his father would not be detrimental to the child, he felt Brooke's return to his father would be disruptive until Brooke made the readjustment. On cross-examination Dr. Matuschka admitted his opinions were based only on his

discussions with Raymond and Brooke and not on any personal evaluation of Valerie or the Woollens. Further, Dr. Matuschka admitted that Raymond's work schedule made him "hard pressed time-wise" to meet his obligations to Brooke. Finally, Dr. Matuschka admitted that Brooke, during the interview, had indicated a preference for staying with his grandparents.

Upon completion of the evidence, the district court stated, in a "decree of dissolution of marriage" entered September 4, 1985:

> [N]either the petitioner, Valerie A. Peterson, nor the respondent, Raymond D. Peterson, are [sic] fit and suitable parents to have custody of the minor child at this time and that it is in the best interests of the child that custody of the child be awarded to Nordon Woollen and Mary Ann Woollen, intervenors . . . .

On September 4 the court also entered another order, as follows:

> [A] follow-up examination of the child, Brooke Ian Peterson, should be performed by Dr. Ernest Matuschka and Dr. Gerald Daly in March of 1986 to determine the emotional state and condition of the child at that time. The parties should notify the psychologists of the contents of this Order and arrange for each psychologist to prepare such a report in March of 1986. Each psychologist should prepare a report and submit the original to Judge Bernard Sprague with a copy of each report to counsel of record.
>
> IT IS THEREFORE CONSIDERED, ORDERED, ADJUDGED AND DECREED BY THE COURT that a follow-up examination of the child, Brooke Ian Peterson, should be performed by Dr. Ernest Matuschka and Dr. Gerald Daly in March of 1986 and the reports should be furnished to the Court with copies to counsel of record.

Raymond Peterson has appealed from the judgment of the district court and alleges the district court erred in finding that the respondent was unfit to serve as custodial parent and in finding that the best interests of Brooke require the placement of the child with the Woollens. Valerie Peterson has not appealed.

Although our review of the judgment is de novo on the

record, child custody determinations are matters initially entrusted to the sound discretion of the trial court. On appeal the judgment of the trial court will be affirmed in the absence of a clear abuse of discretion. *Clark v. Clark*, 220 Neb. 771, 371 N.W.2d 749 (1985). We also "give weight to the fact that the trial judge observed and heard the witnesses and accepted one version of the facts rather than the other." *Id*. at 777, 371 N.W.2d at 754.

*Ainsworth v. Ainsworth, ante* p. 160, 161, 396 N.W.2d 285, 286 (1986). See, also, *Hicks v. Hicks*, 223 Neb. 189, 388 N.W.2d 510 (1986).

Neb. Rev. Stat. § 42-364 (Reissue 1984) provides:

When dissolution of a marriage or legal separation is decreed, the court may include such orders in relation to any minor children and their maintenance as shall be justified, including placing the minor children in the custody of the court or third parties . . . . Custody . . . of minor children shall be determined on the basis of their best interests.

However, when the controversy as to custody is between the natural parent and other relatives or strangers, the guiding principles are:

Where the custody of a minor child is involved . . . , the custody of the child is to be determined by the best interests of the child, with due regard for the superior rights of a fit, proper, and suitable parent.

The courts may not properly deprive a parent of the custody of a minor child unless it is affirmatively shown that such parent is unfit to perform the duties imposed by the relationship, or has forfeited that right.

The right of a parent to the custody of his minor child is not lightly to be set aside in favor of more distant relatives or unrelated parties, and the courts may not deprive a parent of such custody unless he is shown to be unfit or to have forfeited his superior right to such custody.

*Nielsen v. Nielsen*, 207 Neb. 141, 149, 296 N.W.2d 483, 488 (1980).

On our review of the record, we find that the district court did not abuse its discretion in determining that Raymond

Peterson was unfit to be the custodial parent of Brooke. The evidence presented relating to Raymond's continuing drinking problem, his failure to support his wife and Brooke during the marriage, and the unsuitable parenting schedule he intends to maintain supports the decision of the district court that Raymond is not fit to be a custodial parent. See *Ainsworth v. Ainsworth, supra.*

An abundance of evidence was offered to show the positive adjustment Brooke has made to living with his grandparents, including evidence which indicated that he preferred to maintain that living arrangement. See *State ex rel. Sanders v. Doyle,* 187 Neb. 453, 191 N.W.2d 545 (1971). The relative age of the Woollens, their financial stability, and the positive involvement with Brooke indicate that the Woollens may be suitable persons to have physical custody of Brooke Peterson.

However, we are concerned about the living arrangement at the home of Nordon and Mary Ann Woollen involving the presence of Valerie Peterson in that arrangement. Evidence indicates that there remains some danger to Brooke should he be left unattended with Valerie while in the custody of the Woollens. In apparent recognition of this problem, the district court ordered followup examinations in March of 1986 by Drs. Matuschka and Daly to determine Brooke's emotional status and to report their findings to the court. The results of the followup examinations, if such examinations have taken place, are not a part of the record before us.

We agree with the precaution taken by the district court in seeking additional information about Brooke, but this raises a question as to whether or not the district court should have retained legal custody of Brooke under the circumstances. It is clear that a district court may maintain legal custody while awarding physical custody to a parent or other party. See § 42-364. See, also, *Swearingen v. Swearingen,* 201 Neb. 255, 267 N.W.2d 514 (1978); *Mason v. Mason,* 200 Neb. 476, 263 N.W.2d 865 (1978). As we stated in *Bartlett v. Bartlett,* 193 Neb. 76, 78-79, 225 N.W.2d 413, 415 (1975):

> Section 42-364, R.R.S. 1943, authorizes the court to place the custody of minor children in the court, to determine custody on the basis of the best interests of the

children, and to make subsequent changes when required. When the best interests of the children, in regard to custody, is not clear, the court may, and should, place custody in the court. In regard to such disposition we have stated that: "Its purpose is to 'facilitate judicial supervision and summary power to act swiftly in their [the children's] best interests.' * * * The parent having possession where the court has retained custody is in effect an agent of the court." Benson v. Benson, 190 Neb. 87, 206 N.W.2d 51.

See, also, *Berry v. Berry,* 202 Neb. 540, 276 N.W.2d 200 (1979). Further, we have admonished that "[t]he interests of minor children should be safeguarded even to the extent of taking precautions which may prove to be unnecessary." *Bralick v. Bralick,* 194 Neb. 183, 184, 231 N.W.2d 129, 131 (1975).

We find that the district court abused its discretion by placing legal custody of Brooke Peterson with the Woollens. The district court should have retained legal custody for the purpose of protecting Brooke's best interests and ensuring that he would be protected from any adverse behavior of his mother, i.e., by eliminating the possibility that he would ever be left alone with Valerie Peterson as long as her condition remains as it has been in the past. We do not feel that the information in the record is current enough to enter an order regarding physical location or physical custody of the child. The district court has also indicated some concern in view of the supplemental reports to be made by the psychologists and a reevaluation concerning the child's well-being 6 months after the trial in the dissolution proceedings. For this reason, we reverse the judgment of the district court and remand these proceedings to the district court with direction that the legal custody of Brooke Peterson be placed in the district court and that further evidence, if such evidence has not already been received, be provided to the district court, bearing upon the placement of physical custody in the best interests of Brooke Peterson.

REVERSED AND REMANDED WITH DIRECTION.