IN RE ADOPTION OF KASSANDRA B. AND NICHOLAS B.
TIMOTHY L. SAVAGE AND KAREN M. SAVAGE, APPELLANTS, V.
MARTIN G., INTERVENOR-APPELLEE.
524 N.W.2d 821

Filed December 6, 1994.    No. A-94-101.

Herbert J. Elworth and Roger K. Johnson, of Casey, Elworth & Johnson, for appellants.

Catherine Mahern, of Creighton Legal Clinic, for intervenor-appellee.

SIEVERS, Chief Judge, and HANNON and MUES, Judges.

SIEVERS, Chief Judge.

During the 6 years that Anita B. and Martin G. lived together, but unmarried, two children, Nicholas B. and Kassandra B., were born. After the parents separated, Anita relinquished custody of the children to K.E.S.I.L. International Adoption Services without Martin's knowledge. The two children were placed for adoption with Timothy L. and Karen M. Savage. This case involves the Savages' attempt to adopt the children and Martin's attempt to gain custody of his children. The county court for Cass County, where the Savages' petition for adoption was filed, found a valid relinquishment of the children by Anita, terminated the parental rights of Martin, and placed custody of the children with K.E.S.I.L. The district court, upon Martin's appeal, reversed the order of the county court which terminated his parental rights, and remanded the matter to the county court for further proceedings. The Savages have properly perfected their appeal of the district court order to this court. For the reasons set forth herein, we affirm in part the order of the district court for Cass County, but also order that Martin shall have custody of his children.

## FACTUAL BACKGROUND

In November 1980, when Martin was 15 years old, he met Anita, and in 1982, a child was born to them, but that child is

not involved in these proceedings. Martin and Anita began living together in 1984, and during the period of time that they lived together, Kassandra was born in May 1986 and Nicholas was born in July 1989. While they lived together, Martin performed many fatherly duties for the children, including attending parent-teacher conferences and school carnivals, preparing meals, bathing the children, and providing financial support.

Martin and Anita separated on August 10, 1990. From the time of the separation until Anita's relinquishment on November 2, 1991, Martin maintained contact through visitation with the children. He also testified that he bought some clothing, diapers, toys, and groceries for the children. Martin also said that he gave Anita about $500 for support of the children during the time period following the separation until November 1991, when he learned of the relinquishment of the children.

In approximately October 1991, Anita broached the subject with Martin of placing the two youngest children for adoption. He was opposed to any adoption and refused to discuss it with her. Anita testified that in the summer and fall of 1991, she had begun thinking about adoption because she was having a hard time financially, and she wanted "a better home, more stable family, you know, a dad" for the children. During this time, Anita had been in contact with a California adoption agency whose name she secured from a newspaper advertisement. She provided Martin's name to them as the father of the children, and when he was contacted, he expressed his opposition, which apparently ended that agency's interest in the children. Anita then found K.E.S.I.L. in the phone book and relinquished the children to K.E.S.I.L. on November 2, 1991, by written agreement, which was accepted on the same date. However, Anita did not disclose Martin as the father of the children when she relinquished them to K.E.S.I.L. On that same day, November 2, Kassandra and Nicholas were placed with the Savages, and a copy of the child acceptance agreement from the Savages is in evidence, indicating that the "adoptive placement" was "term[ed a] 'legal risk' because the birth fathers of the children have not been named, identified on the

child's birth records or signed a relinquishment of parental rights."

On November 11, Martin telephoned Anita to discuss the children's attendance at his upcoming wedding to another woman on November 15. Anita told Martin that the children had been placed for adoption, but refused to divulge with whom or where they were presently located. In Anita's testimony, she admitted that she had not disclosed Martin as the father of the children because she knew he would refuse an adoption. Anita admitted that she lied in order to get the children adopted.

After Martin received this information, he attempted, without success, to locate the children by calling the adoption agencies he found listed in the phone book. The following day, on November 12, after consulting with counsel, he faxed signed notices of intent to claim paternity with respect to Kassandra and Nicholas to the Department of Social Services (DSS), and the parties stipulated during this litigation that such notices were filed then for the first time.

The Savages were informed of Martin's identity in July 1992 by an agent from K.E.S.I.L. and made inquiry to DSS in October 1992, at which time they discovered that Martin had filed a notice of intent to claim paternity. The Savages filed their petition for adoption of the two children on October 20, alleging that the claim of paternity filed by Martin should not be recognized pursuant to Neb. Rev. Stat. § 43-104.02 (Reissue 1993) for the reason that the claim was barred as not having been filed within 5 days after the birth of each child and, further, that his claim of paternity should be barred by reason of abandonment.

Martin filed a pleading in the county court entitled "Motion in Opposition of Adoption and Request for Custody" in which he requested an order "pursuant to Neb.Rev.Stat. 43-104.06 (reissue 1988) granting him care, custody, and control" of the children.

## COUNTY COURT DECISION

The county court, citing *In re Application of S.R.S. and M.B.S.*, 225 Neb. 759, 408 N.W.2d 272 (1987), declined to hold

Martin to the requirement of filing a notice of his claim of paternity with DSS within 5 days of the children's birth pursuant to § 43-104.02 on the ground that there was evidence of filiation, and thus, the statute would be unconstitutional as applied to Martin. The county court then turned to Neb. Rev. Stat. § 43-104.06 (Reissue 1993), finding that subsection (1) of that statute was not applicable, since it dealt with claims of paternity in the event of a "proposed relinquishment," whereas the relinquishment by Anita was completed November 2, 1991. Thus, the county court found that § 43-104.06(2) was the applicable statute. That subsection provides:

> (2) Except as otherwise provided in the Nebraska Indian Child Welfare Act, upon relinquishment by the mother to a child placement agency licensed by the State of Nebraska, or upon a finding that the child's best interests would not be served by granting custody to the claimant, together with the recommendation by the guardian ad litem, and a finding that termination of the rights of the mother and the father is in the best interests of the child, the court shall terminate the rights of the mother and father and confer such rights upon the licensed child placement agency to whom the relinquishment has been given.

The county court interpreted the statute so that the court considered whether there was sufficient evidence to terminate parental rights before it considered the question of the best interests of the children. The county court used Neb. Rev. Stat. § 43-292 (Reissue 1993), which sets forth various statutory grounds for termination of parental rights under the Nebraska Juvenile Code. The county court found that there was "clear and convincing evidence the conditions are [sic] set out in paragraphs 2, 3, and 4 of § 43-292 exist." Those statutory grounds for termination of parental rights are set forth as follows:

> (2) The parents have substantially and continuously or repeatedly neglected the juvenile and refused to give the juvenile necessary parental care and protection;

> (3) The parents, being financially able, have willfully neglected to provide the juvenile with the necessary

subsistence, education, or other care necessary for his or her health, morals, or welfare or have neglected to pay for such subsistence, education, or other care when legal custody of the juvenile is lodged with others and such payment ordered by the court;

(4) The parents are unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct is found by the court to be seriously detrimental to the health, morals, or well-being of the juvenile.

§ 43-292.

The county court then considered the best interests of the children, finding that since the time of Anita's relinquishment the children had been in a stable and nurturing environment, both emotionally and financially, and that to place the children with Martin would create instability in their lives and would not be in their best interests. The county court then ordered three things: (1) the termination of the parental rights of Anita by reason of her valid relinquishment; (2) the termination of the parental rights of Martin under § 43-292; and (3) that custody of the children be placed with "K.E.S.I.L. Adoption Agency for suitable placement."

## DISTRICT COURT DECISION

Martin appealed to the district court and filed a statement of errors in which he alleged, among other errors, that § 43-104.06(1) was unconstitutional as applied by the county court and that subsection (2) of that statute was unconstitutional on its face.

The district court agreed with the county court that under *In re Application of S.R.S. and M.B.S., supra*, application of the statute providing for a 5-day period in which to claim paternity and file with DSS would be unconstitutional given the facts of this case. However, the district court then parted company with the county court, finding that since the 5-day requirement of § 43-104.02 was not applicable, neither were Neb. Rev. Stat. §§ 43-104.03 through 43-104.06 (Reissue 1993). The district court further held that the county court was without jurisdiction "in the adoption case to consider termination of

parental rights under the Juvenile Code." Additionally, the district court held that Martin's due process rights were violated, as he was not put on notice by the pleadings, or otherwise, that his parental rights might be terminated under the Nebraska Juvenile Code. The district court also concluded that "although [Martin] may not be the perfect parent, the record does not support that [Martin] was unfit. Even [Anita] testified that she did not think [Martin] to be unfit." Consequently, the judgment of the county court was reversed and the matter remanded for further proceedings.

## ASSIGNMENTS OF ERROR

In their appeal to this court, the Savages claim that the district court erred in reversing the judgment of the county court by finding §§ 43-104.06(2) and 43-292 inapplicable. Second, the Savages contend that the district court erred in holding that the county court's use of § 43-292 of the Nebraska Juvenile Code violated Martin's right to due process. Third, the Savages assign error in the district court's conclusion that the evidence was insufficient to terminate Martin's parental rights.

## STANDARD OF REVIEW

■ These proceedings were initiated for the ultimate purpose of the adoption of Nicholas and Kassandra by the Savages. Appeals in adoption proceedings are reviewed by a district court and an appellate court for error appearing on the record. *In re Guardianship of T.C.W.*, 235 Neb. 716, 457 N.W.2d 282 (1990); Neb. Rev. Stat. § 25-2733 (Reissue 1989). As to questions of law, an appellate court is obligated to reach its conclusions independent of the determinations of the trial court. *Boyles v. Hausmann*, 246 Neb. 181, 517 N.W.2d 610 (1994).

## ANALYSIS

*Five-Day Paternity Claim Statute.*

Although the Savages do not argue directly that § 43-104.02, which prevents the recognition of the rights of an alleged father unless he has filed a notice of intent to claim paternity with DSS within 5 days, is determinative, it is nonetheless important as a preliminary matter that we consider the law relating to this

statute. In *Shoecraft v. Catholic Social Servs. Bureau*, 222 Neb. 574, 385 N.W.2d 448 (1986), the court upheld the constitutionality of the statute, even though it treated mothers and fathers differently, as it enabled a speedy determination of the rights of the father so as to make it possible for the State to achieve a legitimate end: the placement of children born out of wedlock as soon as possible after birth. However, as noted in a subsequent decision, *Shoecraft* was not a case where the father had lived with the child and its mother and provided support and nurturing. See *In re Application of S.R.S. and M.B.S.*, 225 Neb. 759, 408 N.W.2d 272 (1987).

*In re Application of S.R.S. and M.B.S.* involved an attempt by a natural father to stop an adoption, even though he had not filed the 5-day notice contemplated in § 43-104.02. The court observed that the father had provided for and had daily contact with his child for the first 19 of the 24 months of the child's life, before the mother had placed the child with the Child Saving Institute. The court stated:

> We found in *Shoecraft* the 5-day filing requirement for unwed fathers to be a legitimate means of attaining a worthy end, the rapid placement of newborns in families that could commit to raising them. However, the 5-day requirement secures no such result in cases such as this one, where the child is no longer a newborn and has already established strong ties with a father who has acknowledged and supported him. The effect of the requirement is to allow a mother to singlehandedly sever a relationship between father and child, no matter what the quality of that relationship is.

225 Neb. at 768-69, 408 N.W.2d at 278.

The court found § 43-104.02 unconstitutional as applied in *In re Application of S.R.S. and M.B.S.* The Supreme Court's rationale had a number of predicates, including the constitutionally protected relationship between parent and child found in *Shoecraft, supra,* and that such right was fundamental in nature, which requires that a statute interfering with such right be subjected to strict scrutiny. Additionally, the Nebraska Supreme Court quoted from *Lehr v. Robertson*, 463 U.S. 248, 103 S. Ct. 2985, 77 L. Ed. 2d 614 (1983):

"[T]he mere existence of a biological link does not merit equivalent constitutional protection." The Court recognized the importance of familial bonds, stressing that "[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,' [citation omitted] his interest in personal contact with his child acquires substantial protection . . . ."

225 Neb. at 768, 408 N.W.2d at 278.

From these predicates, the court in *In re Application of S.R.S. and M.B.S.* concluded that there was no compelling interest which the State secures by allowing a 2-year familial relationship to be severed for failure to file within 5 days of birth that would justify, on the grounds of gender and marital status, the disparate treatment of the appellant father from those similarly situated.

The factual situations in *In re Application of S.R.S. and M.B.S.* and the instant case are remarkably similar in that Martin had a familial relationship from the time of the birth of Nicholas and Kassandra, lived with them and their mother, and provided support and nurturing. To cut off all of his rights under the 5-day claim statute would be no less offensive here to constitutional principles than it was in *In re Application of S.R.S. and M.B.S.* The Supreme Court in *Shoecraft* made § 43-104.02 inapplicable in cases where there was an established familial relationship. This is the situation here, and we hold that § 43-104.02 may not be applied to Martin.

*Termination of Parental Rights in an Adoption Proceeding.*

As we understand the county court's opinion and order, the court applied § 43-104.06(2), but the court acknowledged the obvious due process difficulty with terminating parental rights solely on the basis of the best interests of the children, as the statute appears to allow, without regard to parental fitness and the doctrine of parental preference. Thus, to address that perceived deficiency in the statutory language of § 43-104.06(2), the county court used the termination of parental rights provisions of the Nebraska Juvenile Code found at § 43-292. Using this procedure, the county court terminated

Martin's parental rights. The district court reversed the judgment, finding that the county court was without jurisdiction in an adoption case to terminate parental rights under the Nebraska Juvenile Code.

Neb. Rev. Stat. § 24-517(8) (Cum. Supp. 1994) provides that each county court shall have "[e]xclusive original jurisdiction in all matters of adoption." It is also worthy of note as we begin our analysis that the Supreme Court has previously said:

> In the case of In re Petition of Ritchie, 155 Neb. 824, 53 N. W. 2d 753, this court said: "The matter of adoption is statutory, and the manner of procedure and terms are all specifically prescribed and must be followed. Kofka v. Rosicky, 41 Neb. 328, 59 N. W. 788, 25 L. R. A. 207, 43 Am. S. R. 685. * * *
>
> "The applicable rules are:
>
> " 'A court of equity, in dealing with legal rights, adopts and follows the rules of law, in all cases to which those rules are applicable, and whenever there is an explicit statute or a direct rule of law governing the case in all its circumstances, a court of equity is as much bound by it as would be a court of law.' State ex rel. Sorensen v. State Bank of Omaha, 128 Neb. 148, 258 N. W. 260. * * *
>
> "Adoption proceedings do not depend upon equitable principles. Where the essential statutory requirements have not been met, equity cannot decree an adoption. 2 C. J. S., Adoption of Children, § 1, p. 368. See, also, St. Vincent's Infant Asylum v. Central Wisconsin Trust Co., 189 Wis. 483, 206 N. W. 921; Borner v. Larson, 70 N. D. 313, 293 N. W. 836; In re Francis, 82 Ohio App. 193, 77 N. E. 2d 289; Rivers v. Rivers, 240 Ala. 648, 200 So. 764."

*McCauley v. Stewart*, 177 Neb. 759, 768-69, 131 N.W.2d 174, 179-80 (1964). Moreover, adoption statutes will be strictly construed in favor of the rights of natural parents in controversies involving termination of the relation of parent and child. *In re Adoption of Simonton*, 211 Neb. 777, 320 N.W.2d 449 (1982).

On appeal, the Savages argue that Martin invoked § 43-104.06(2) and that as a result he is subject to "the best

interests test, and the possible termination of his parental rights." Brief for appellants at 13. The Savages' argument is that the district court's interpretation "simply excises Section 43-104.06 from the statute books." Brief for appellants at 13. The Savages claim that the parental preference rule in *Stuhr v. Stuhr*, 240 Neb. 239, 481 N.W.2d 212 (1992), was abrogated when Martin invoked § 43-104.06(2) in his request for custody. We cannot agree with this argument.

The *Stuhr* court held that in the absence of a statutory provision to the contrary, in a child custody controversy between a biological or adoptive parent and one who is neither a biological nor an adoptive parent of the child involved in the controversy, a fit biological or adoptive parent has a superior right to custody of the child. See, also, *Cavanaugh v. deBaudiniere*, 1 Neb. App. 204, 493 N.W.2d 197 (1992) (holding that although husband and wife were both fit and proper persons to have custody of the child, custody in a dissolution action should have been awarded to wife, the biological parent, in light of blood test showing that husband was not the child's biological father).

We are convinced that § 43-104.06 does not abrogate the doctrine of parental preference. Instead, the statute must be strictly scrutinized and narrowly applied because it impacts the constitutionally protected parent-child relationship. See *Shoecraft v. Catholic Social Servs. Bureau*, 222 Neb. 574, 385 N.W.2d 448 (1986). The statute, § 43-104.06, is headed "Paternity claim; request for custody by *claimant* . . . ," and the language therein expressly refers to "the claimant." (Emphasis supplied.) We examine §§ 43-104.02 through 43-104.06 together, as they were collectively enacted as part of 1975 Neb. Laws, L.B. 224. A collection of statutes pertaining to the same subject matter may be conjunctively considered and construed to determine the intent of the Legislature so that different provisions of the act are consistent, harmonious, and sensible. See *Smith v. Smith*, 242 Neb. 812, 497 N.W.2d 44 (1993). We also presume that the Legislature intended a sensible rather than an absurd result. *Coleman v. Chadron State College*, 237 Neb. 491, 466 N.W.2d 526 (1991).

Sections 43-104.02 through 43-104.06 deal with claims of

paternity to be made by an alleged father within 5 days of the birth of the child, the entity with whom the claim is to be made and filed, the effect of the lack of such a claim, the procedure for a mother to contest a claim of paternity, and the procedure for the "*claimant* . . . to oppose any proposed relinquishment of a child by the mother" and to gain custody. (Emphasis supplied.) § 43-104.06(1).

Given the language used throughout these statutes, it is clear that they apply only to a "claimant," i.e., one who is without a familial relationship, see *Shoecraft, supra,* and who has filed a paternity claim under § 43-104.02. An alleged father who makes a claim of paternity within the first 5 days of the child's life is a "claimant" for purposes of § 43-104.06. Therefore, under the undisputed evidence in this case, Martin is not a "claimant."

The Savages' argument that § 43-104.06(2) has been invoked by Martin's pleading, which, therefore, allows the termination of his parental rights so as to allow the adoption to proceed over his objections, ignores three fundamental precepts: (1) All adoptions require parental consent, except in the limited circumstances specified in Neb. Rev. Stat. § 43-104 (Reissue 1993); (2) the county court in an adoption proceeding is not authorized to order the termination of parental rights under the Nebraska Juvenile Code, but may appoint a guardian ad litem who may execute a substitute consent; and (3) it is the adoption itself which terminates parental rights. See *In re Guardianship of Sain,* 211 Neb. 508, 319 N.W.2d 100 (1982). Additionally, the claim that Martin has invoked § 43-104.06(2), which allows the county court to terminate his parental rights, runs counter to the rule that the parties cannot confer jurisdiction upon a court to do what it otherwise lacks the power to do. See *Scherbak v. Kissler,* 245 Neb. 10, 510 N.W.2d 318 (1994).

Section 43-104 sets forth that consent to an adoption is required of

(3) both parents if living, the surviving parent of a child born in lawful wedlock, or, subject to sections 43-104.02 to 43-104.06, the mother of a child born out of wedlock, except that consent shall not be required of any parent who (a) has relinquished the child for adoption by a

written instrument, (b) has abandoned the child for at least six months next preceding the filing of the adoption petition, (c) has been deprived of his or her parental rights to such child by the order of any court of competent jurisdiction, or (d) is incapable of consenting.

Martin has not relinquished the children, he is not incapable of consenting, and the parties stipulated at trial that he has not abandoned the children. Moreover, the need for his consent is not obviated by his failure to file a claim of paternity under §§ 43-104.02 through 43-104.06, since we have determined that those provisions do not apply to him. Accordingly, his consent could have been rendered unnecessary under category (c) only; however, the record is abundantly clear that at the time of the filing of the adoption proceeding, his parental rights had not been terminated by any court. Therefore, this takes us directly to the second issue: Could the county court, in the adoption proceeding, terminate Martin's parental rights using the Nebraska Juvenile Code provisions for termination of parental rights found in § 43-292?

The Nebraska Supreme Court has held in *Sosso v. Sosso*, 196 Neb. 242, 243-44, 242 N.W.2d 621, 623 (1976), that "[u]nder the Nebraska statutes a termination of parental rights can only be decreed by a juvenile court in a proceeding brought for that purpose. See § 43-209, R. S. Supp., 1974." Most of the language of § 43-292, which now provides for termination of parental rights by juvenile courts, was previously found at Neb. Rev. Stat. § 43-209 (Reissue 1978). In *Sosso*, the order of the district court terminating parental rights to the minor children in a divorce proceeding was reversed because of a lack of jurisdiction. Since *Sosso* was decided, the Legislature has amended the divorce statutes to allow termination of parental rights on specific grounds in a divorce action by either the district court or the juvenile court, whichever court is the "more appropriate forum." Neb. Rev. Stat. § 42-364(7) (Cum. Supp. 1994).

In *Rejda v. Rejda*, 198 Neb. 465, 253 N.W.2d 295 (1977), the Supreme Court had an occasion to revisit its holding that termination of parental rights can be ordered only by a juvenile court in a proceeding brought for that purpose. The court in

*Rejda* did not abandon *Sosso*, but Justice White announced his opposition to the *Sosso* holding. Nonetheless, we read *Sosso* as still being binding authority, except as modified by § 42-364(7), which is not applicable here.

We next turn to *In re Guardianship of Sain, supra,* which involved an attempt by a mother's new husband to adopt the child of her former marriage, custody of whom had been awarded to her in the divorce. The Supreme Court stated that

> [t]he principal issue we are asked to address by this appeal is the appropriate procedure to be followed when one seeks permission to obtain substitute consent on the basis that one of the parents has abandoned the child, thereby eliminating the necessity of obtaining the natural parent's written consent to the adoption as required by § 43-104.

211 Neb. at 510-11, 319 N.W.2d at 103.

The court reviewed § 43-104 as to when a consent is required for an adoption and held that a guardian must be appointed for a minor who has been abandoned by one of his parents, and, if appropriate, the guardian may execute the consent required by § 43-104. The Supreme Court then concluded that jurisdiction was in the county court, and not the juvenile court, to determine abandonment for the purposes of permitting the use of a substitute consent and appointing a guardian, who thereafter is authorized to execute the consent.

The Supreme Court, recognizing that in 90 of the 93 counties in Nebraska the county court is already the juvenile court, found that "[t]he county court, having been granted exclusive original jurisdiction in all matters involving adoptions, is likewise the proper court to determine whether a parent has abandoned his child so as to permit the use of substitute consent provided for by § 43-105." 211 Neb. at 514-15, 319 N.W.2d at 105.

The court then addressed the question of whether a guardian must be appointed in order to secure substitute consent and who should be appointed guardian. Discussing that issue, the *In re Guardianship of Sain* court held:

> The county court, unlike the juvenile court, does not terminate parental rights upon a finding of abandonment,

but only authorizes the execution of substitute consent. It is the adoption itself which terminates the parental rights, and until the adoption is granted the parental rights are not terminated.

. . . The effect of a finding of abandonment under the adoption statute does not result in the termination of parental rights, as it does under the juvenile act, and therefore implies that the guardian is intended to protect the interests of the child and not the adopting parents.

211 Neb. at 516, 319 N.W.2d at 105-06.

■ Thus, we conclude that even though *In re Guardianship of Sain* deals with the alleged abandonment of a child by a divorced father, the case, nonetheless, also prevents a county court in an adoption proceeding from terminating parental rights under the Nebraska Juvenile Code. A county court does not have jurisdiction to terminate parental rights using the Nebraska Juvenile Code in an adoption proceeding. Rather, it is the adoption itself, after proper consent has been given, which serves to terminate parental rights.

Since the county court decreed the termination of Martin's parental rights in an adoption proceeding, the district court was correct when it reversed and set aside the county court's order. None of the four circumstances of § 43-104 which would obviate the need for Martin's consent to the adoption existed when the county court entered its order. Thus, no adoption could be decreed by the county court. Therefore, we affirm this portion of the district court's decision.

*Parental Preference and Custody Determination.*

The district court, as stated previously, reversed the termination of Martin's parental rights, but remanded the matter to the county court "for further proceedings consistent with this opinion and decision." In its decision, the district court found that Martin was not an unfit parent. It may well be that the district court contemplated upon remand precisely what we expressly order; nonetheless, we believe the district court, having reached the correct conclusions in the case, should have ordered the custody of Kassandra and Nicholas restored to their father pursuant to his request for "care, custody, and

control of the . . . children."

In reaching this conclusion, we rely upon the doctrine of parental preference pronounced by the Nebraska Supreme Court in *Stuhr v. Stuhr*, 240 Neb. 239, 246, 481 N.W.2d 212, 217 (1992):

> The parental preference principle, reflected in *Nielsen* [207 Neb. 141, 296 N.W.2d 483 (1980)] and *Peterson* [224 Neb. 557, 399 N.W.2d 792 (1987)], is recognition that "the relationship between parent and child is constitutionally protected." See *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978). Accordingly, a court may not, in derogation of the superior right of a biological or adoptive parent, grant child custody to one who is not a biological or adoptive parent unless the biological or adoptive parent is unfit to have child custody or has legally lost the parental superior right in a child.

Parental unfitness has been defined as " 'a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being.' " *Uhing v. Uhing*, 241 Neb. 368, 375, 488 N.W.2d 366, 372 (1992). As the district court found, the record does not support any conclusion that Martin is an unfit parent.

In the widely publicized case of *Petition of Doe*, ____ Ill. 2d ____, 638 N.E.2d 181 (1994), *cert. denied* ____ U.S. ____, 115 S. Ct. 499, 130 L. Ed. 2d 408 (1994) (case No. 94-236), and *cert. denied* ____ U.S. ____, 115 S. Ct. 499, 130 L. Ed. 2d 408 (1994) (case No. 94-615), the Supreme Court of Illinois addressed many of the same issues which we face here. In that case, a natural father, unmarried to the mother of his child, was deprived of custody and contact with his child for over 3 years by the proposed adoptive parents to whom the mother had relinquished the child. The Illinois court held that the fact that the proposed adoptive parents could improve the child's future financial, social, and emotional atmosphere is not relevant in judging the fitness of the natural parent. The court in *Petition of Doe* made it clear that the child's best interests cannot justify termination of parental rights where the parent has not been found unfit.

The Illinois Supreme Court in *Petition of Doe* rejected the argument that the child's custody cannot be restored to a natural parent when the child has resided with proposed adoptive parents during lengthy litigation, since such a change would be disruptive to the child and thus not in the child's best interests. The court relied upon the words of Justice Stevens of the U.S. Supreme Court when he wrote in another highly publicized case:

"Applicants' claim that [the child's] best interests will be served by allowing them to retain custody of her rests, in part, on the relationship that they have been able to develop with the child after it became clear that they were not entitled to adopt her. Neither [state] law * * * nor federal law authorizes unrelated persons to retain custody of a child whose natural parents have not been found to be unfit simply because they may be better able to provide for her future and her education. As the Iowa Supreme Court stated: '[C]ourts are not free to take children from parents simply by deciding another home appears more advantageous.' [Citation.]" (*DeBoer v. DeBoer* (1993), 509 U.S. ___, ___-___, 114 S.Ct. 1, 1-2, 125 L.Ed.2d 755, 757.)

___ Ill. 2d at ___, 638 N.E.2d at 185 (McMorrow, J., concurring).

The sanctity of a parent-child relationship and the degree to which it must be protected by courts under Nebraska law have been articulated in *Uhing*, 241 Neb. at 374-75, 488 N.W.2d at 371-72:

A biological or adoptive parent's superior right to custody of the parent's child is acknowledgment that parents and their children have a recognized unique and legal interest in, and a constitutionally protected right to, companionship and care as a consequence of the parent-child relationship, a relationship that, in the absence of parental unfitness or a compelling state interest, is entitled to protection from intrusion into that relationship. Hence, the parental superior right to child custody protects not only the parent's right to the companionship, care, custody, and management of his or

her child, but also protects the child's reciprocal right to be raised and nurtured by a biological or adoptive parent. See *Bellotti v. Baird*, 443 U.S. 622, 99 S. Ct. 3035, 61 L. Ed. 2d 797 (1979) (both parents and children in a familial relationship are protected by the U.S. Constitution). Establishment and continuance of the parent-child relationship " 'is the most fundamental right a child possesses to be equated in importance with personal liberty and the most basic constitutional rights.' " *Johnson v. Hunter*, 447 N.W.2d 871, 876 (Minn. 1989) (quoting from *Ruddock v. Ohls*, 91 Cal. App. 3d 271, 154 Cal. Rptr. 87 (1979)). See, also, *In re Adoption of A.G.K.*, 728 P.2d 1 (Okla. App. 1986) (a child has a constitutionally protected right in preserving parent-child relationship); *Com., Dept. of Social Services v. Johnson*, 7 Va. App. 614, 376 S.E.2d 787 (1989) (a child has a fundamental right in establishment and continuation of the parent-child relationship).

Thus, we believe the law is clear that Martin, the natural parent of Kassandra and Nicholas, who did not consent to their adoption and who is not an unfit parent, is entitled to the immediate custody of his children.

## CONCLUSION

Accordingly, the county court should have dismissed the petition for adoption, as the required consent of the natural father was not present, and should have ordered that the custody of Nicholas and Kassandra be awarded to him as he asked. We remand this matter to the district court, which shall issue its mandate directing the county court to take the steps we have outlined herein.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.