In re Interest of Amanda H., a child under 18 years of age.
State of Nebraska, appellee, v. Velma S., appellee, and Robert H., appellant.

542 N.W.2d 79

Filed January 16, 1996.   No. A-95-666.

Craig H. Borlin for appellant.

James S. Jansen, Douglas County Attorney, and Mary M. Carnazzo for appellee State.

HANNON, IRWIN, and MILLER-LERMAN, Judges.

HANNON, Judge.

In this juvenile proceeding, a child was adjudicated under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1993) without the child's father being allowed to participate in the proceedings, being advised of his rights, or being accorded his right to counsel, in spite of the fact that he was present at all of the hearings. A year after the first hearing, a new judge became aware of the situation and appointed the father an attorney and allowed him to intervene. The father moved the court to dismiss the proceedings for lack of jurisdiction on the basis that he was not made a party. The trial court denied the motion, and the father appeals. We conclude that jurisdiction of the juvenile court under § 43-247(3)(a) is dependent upon whether the child is in fact in need of care at the commencement of the proceedings, and not on whether a parent is allowed to participate in the proceedings. However, we also conclude that the father's due process rights were seriously violated and that on the basis of plain error the initial adjudication proceeding was fatally flawed, and therefore, the court did not acquire jurisdiction of the child. Accordingly, we reverse the judgment and remand the cause with directions to dismiss the proceedings for lack of jurisdiction, without prejudice to the commencement of new proceedings.

## PROCEDURAL BACKGROUND

On March 30, 1994, a deputy county attorney for Douglas County filed a petition alleging in substance that Amanda H., born on May 8, 1993, was found in Douglas County; that the child's mother, Velma S., resided at a specific Omaha address; that Amanda was currently in the custody of the Department of Social Services (DSS); and that Amanda is a child defined in § 43-247(3)(a) because she lacked proper parental care by reason of the faults or habits of Velma. The petition alleged that Velma suffers from manic depression and seizures which impair

her ability to care for Amanda and that she does not cooperate with her medical treatment. The State prayed for a summons to be served upon the "parent" and the persons having custody of the child, requiring them to appear before the court at a time and place stated. The child's father, Robert H., is not mentioned in the petition.

On April 7, 1994, a guardian ad litem was appointed for the child, and an attorney was appointed for Velma. The deputy county attorney had also filed a motion for temporary custody, alleging immediate and urgent necessity for the protection of the child. On April 13, DSS was ordered to take immediate custody of Amanda for placement in foster care. Both parents were present at the April 13 hearing and all of the subsequent hearings, and Velma always appeared with counsel. The judge advised her of all of the rights specified under Neb. Rev. Stat. § 43-279.01 (Reissue 1993) except the right to counsel.

The evidence at the temporary custody hearing consisted of the testimony of the case manager, Ellen Wilkins. Since most of our knowledge about the case is obtained from that hearing, her testimony will be summarized in greater detail than would normally be the case for the evidence adduced at a temporary custody hearing. Wilkins had been working with Velma and one of her other children since September 1992. Amanda was 10 months old at the time of the hearing. Wilkins testified that Velma voluntarily placed Amanda in foster care through DSS for 30 days, and this time had been extended twice. The child was placed in foster care because "[t]here were concerns; lack of housing and mom's mental condition, to include her psychological well-being." Wilkins testified, "She indicated to me that she was going to divorce her husband who she alleged was being physically abusive to her, and she did not have housing at that time."

In the course of her testimony, Wilkins reported that she had had conversations with "and/or" reviewed reports of a psychiatrist or psychologist. Wilkins then testified that Velma was supposed to be under treatment, but had not kept appointments. Wilkins reported Velma was seeing a psychiatrist at the Douglas County Hospital. Velma was seen by Dr. Michael Coy and Dr. Michael Kelly, a psychologist. By having

conversations with these individuals and reviewing their reports, Wilkins became aware that Velma "suffers from mental illness." Dr. Kelly diagnosed her as suffering from "major depression, single episode." Velma was supposed to be continuing in treatment and taking medication. Velma stated to Wilkins that in February 1994 she had not taken her medication, but had done so in the past month. Wilkins had knowledge that Velma was diagnosed as chemically dependent and that she was to refrain from drinking.

Wilkins testified that Velma suffers from seizures, and Velma told her that during the month of February 1994 she fell down the stairs. She has been told not to drive, but she does so anyway. Wilkins testified that Velma told her that Dr. Stan Moore, a psychologist, tested Velma; that he said her seizures were not caused by epilepsy but by stress; and that he took her off medication. In February, Velma said she had suicidal thoughts, and on several occasions Velma said she felt overwhelmed. This indicated that she suffered from depression and needed "inpatient ongoing supervision."

When foster care was started, Velma was supposed to find housing, participate in therapy, and file for divorce. Apparently, Velma also has an older child who is the subject of separate juvenile proceedings, and it appears that the conditions of the dispositional plan for that child were the same or similar to the voluntary foster care arrangement for Amanda. Wilkins testified that Velma did not comply, and they agreed on a 30-day extension. Velma then moved in with a friend, started drinking again, and was having seizures. She also stated to Wilkins that she was suicidal.

Wilkins testified that when Amanda came into foster care she was not "up to date on her immunizations," and she had a bald spot on the back of her head. She was not "up to snuff developmentally," that is, she was not able to sit up without being tied with a towel, but was able to sit upright by the time of the hearing. Wilkins would have expected her "to sit up on her own and do some of those things." (We observe that time elements indicate that Amanda came into foster care at 7 or perhaps 8 months of age.) She could not recommend that Amanda be allowed to go home with Velma at the time of the hearing.

On cross–examination, Wilkins admitted that she had no basis for her testimony regarding Velma's medical condition and treatment, other than what Velma had told her and the most recent psychological evaluation from February 1993. She did not know what "major depression, single episode" meant. Velma reported to her that Velma suffered from manic depression. The only report Wilkins had of Velma putting Amanda at risk was a report from a family support worker that Velma had left Amanda in her apartment and gone "across the way to do some laundry."

At the conclusion of the hearing, the court ordered Amanda detained by DSS temporarily, and Velma was given reasonable visitation, to be supervised because of "the mother's use of alcohol and her propensity to have seizures, which she herself, I presume, cannot control."

An adjudication hearing was held on August 24, 1994, after various continuances. Both parents were again present at that hearing; no witnesses were sworn. The judge stated, "And you originally had a detention hearing, is that right, at which time I told you what your rights were. Do you remember that, mother?" Velma said she had no questions about her rights.

> THE COURT: So after talking to your lawyer, do you wish to admit or deny these charges?
>
> [VELMA]: I admit these charges.
>
> THE COURT: He showed you the paper with that one line drawn through, right? So in other words, you're telling me the children lack proper parental care by reason of your faults or your habits in that you suffer from depression and seizures which impair your ability to care for the child, right?
>
> [VELMA]: Yes.
>
> THE COURT: And that you do not always cooperate with your medical treatment. That means you don't do what the doctor tells you to do all the time; is that correct? That's true?
>
> [VELMA]: That's true.

The judge then quizzed Velma why and to what extent she failed to follow her doctor's direction and about her doctor, her medication, and her injured arm. In the course of the colloquy,

Velma stated that she was living with her husband at the Open Door Mission, but they were planning to move to a two-bedroom apartment. Velma referred to "Bob, that man sitting right there," and the judge replied, "Well, he's not involved in the case. This all reads from your viewpoint, okay?"

The judge then asked: "And admitting this, you know that your child will remain in foster care until the foreseeable future until we can get back on an even keel?" At the end of the hearing, a lawyer told the judge that Robert desired to speak to the court. He asked for visitation, and the judge told him he would have to take that up with the guardian ad litem and Wilkins and, if no agreement could be reached, to come back.

In the order issued after that hearing, the court found, among other items, that Amanda is a child "within the meaning of Section 43-247(3a) . . . by a preponderance of the evidence based on the admission plea entered herein and accepted by the Court."

A journal entry shows a dispositional hearing was held on October 21, 1994, and as a result, the court ordered custody of Amanda to remain with DSS and ordered Velma to do certain things such as obtain her own housing and appropriate income and get treatment and counseling for her chemical dependency and treatment for "her existing medical issues." The court also ordered that the "family" be allowed reasonable rights of visitation to be supervised and arranged by DSS.

A different judge handled the later hearings. At a review hearing held on April 18, 1995, Wilkins testified, and at the end of the hearing Robert asked to be heard. This made the judge aware that Amanda's father was present, that he was married to Velma, and that they were living together. The judge inquired why he was not mentioned in the pleadings, and the guardian ad litem stated: "I'm just saying they haven't been physically together consistently throughout these proceedings. In and around at the time of the petition being filed, [Robert] was in South Dakota and Velma was maintaining a residence in Omaha." The replacement judge announced he would appoint Robert counsel upon the filing of a proper poverty affidavit.

In the journal of that hearing, the court found reasonable efforts had been made, but the best interests of the child

required temporary custody to be in DSS. Velma was allowed reasonable supervised visitation rights to "occur on a weekly basis for one hour." The order stated, "The Court further notes that this matter is referred to the County Attorney's Office and to the Guardian ad Litem to be taken under advisement and reviewed for possible termination of parental rights."

On May 4, 1995, Robert's court–appointed attorney filed a motion to intervene and a motion requesting the court to terminate jurisdiction. A hearing was held May 26. No evidence was adduced, and at the conclusion, the court granted the motion to intervene, but denied the motion to terminate jurisdiction. Robert appeals from the latter order.

## ASSIGNMENTS OF ERROR

Robert alleges the trial court erred (1) in finding that it had jurisdiction over Amanda; (2) in ordering custody in DSS when a "non–petitioned custodial parent" was present at the hearing of April 13, 1994, and all subsequent hearings; (3) in denying his motion to terminate jurisdiction; and (4) in finding that the "non–petitioned custodial parent" must show the court that he is a fit parent before ordering custody from DSS to that parent.

## STANDARD OF REVIEW

The following rule controls the standard of review in this case:

> [W]here a jurisdictional question does not involve a factual dispute, determination of the issue is a matter of law which requires an appellate court to reach a conclusion independent from that of the inferior court, *Wagner v. Unicord Corp., ante* p. 217, 526 N.W.2d 74 (1995); however, where such a question rests on factual findings, a trial court's decision on the issue will be upheld unless the factual findings concerning jurisdiction are clearly wrong . . . .

*In re Interest of Constance G.*, 247 Neb. 629, 632, 529 N.W.2d 534, 537–38 (1995).

In this case, there is no factual dispute, at least not that affects the question of jurisdiction. We are therefore confronted with a question of law and must reach a conclusion independent of the trial court.

## DISCUSSION

As a general proposition, we note the unsatisfactory record in this case. The only factual information in the record before the adjudication order is the rather vague testimony of Wilkins at the temporary custody hearing held on April 13, 1994, and the few admissions the judge elicited from Velma during her interrogation at the August 24, 1994, hearing. The unsupported assertions of attorneys during court proceedings do not establish the facts asserted unless the other appropriate parties stipulate to such facts. Probably, the judge and the attorneys were aware of many facts from hearings involving Velma's other child, or from consultations in chambers, but the record is practically devoid of any properly established facts. For instance, we know where Robert was at the time the petition was filed only by the assertion of the guardian ad litem to the judge at the April 18, 1995, hearing. The record of the adjudication hearing does not make sense unless the reader is aware of the testimony at the temporary custody hearing. No factual basis was given at the adjudication hearing.

We also note that no evidence or stipulations were offered at the hearing of May 26, 1995, although the attorneys included in their arguments such facts as they thought significant to the judge's decision on the motion to intervene and the motion to terminate jurisdiction. We caution that this is not the proper procedure for any motion requiring facts as the premise for some act by a judge at a hearing.

*Procedural Jurisdiction.*

The basis of Robert's claim that the trial court lacked jurisdiction is that the petition alleges that Amanda was a child lacking proper parental care by reason of the faults or habits of Velma, but it contains no allegations against him, and the petition did not make him a party or give him any notice that his rights were affected. Hence, he argues that the juvenile court did not acquire jurisdiction over Amanda or him and that he is entitled to the custody of Amanda because he is her father.

We note that in his assignments of error Robert refers to a "non–petitioned custodial parent." We understand that by the "non–petitioned" part of that expression Robert is referring to

a parent who is not included as a party in the operative petition upon which the jurisdiction of the juvenile court is based. In that sense, Robert was clearly a "non-petitioned" parent. However, the "custodial" parent part of Robert's designation is not established by any evidence. And such record as we have clearly shows that Amanda was in the custody of DSS for at least 60 days and perhaps 90 days before the petition was filed and that Velma had sole custody of Amanda for at least some time before DSS.

For purposes of considering the effect of the failure to make Robert a party, we shall assume that the petition states facts which if proved would give the juvenile court jurisdiction and that these facts were proved at the adjudication hearing. Section 43-247(3)(a) gives the juvenile court jurisdiction over any juvenile who lacks proper parental care by reason of the fault or habits of his or her parent.

The recent case *In re Interest of Constance G.*, 247 Neb. 629, 529 N.W.2d 534 (1995), gives some guidance. In that case, the mother admitted the allegations under § 43-247(3)(a), and the father pled no contest, to the effect that the child was homeless and destitute, or without proper support through no fault of his or her parents, guardian, or custodian. In *In re Interest of Constance G.*, 3 Neb. App. 1, 520 N.W.2d 784 (1994), this court had held the juvenile court lacked jurisdiction because there was insufficient evidence with regard to the father. In *In re Interest of Constance G., supra*, the Supreme Court reviewed the authorities and concluded the rule is: "In a dependency action, the only inquiry is whether a child is in need of care which for any reason is not being provided." 247 Neb. at 633, 529 N.W.2d at 538. We think this ruling must be read in light of previous rulings to this effect: "If evidence of the fault or habits of a parent or custodian indicates a risk of harm to a child, the juvenile court may properly take jurisdiction of that child, even though the child has not yet been harmed or abused." *In re Interest of M.B. and A.B.*, 239 Neb. 1028, 1030, 480 N.W.2d 160, 161-62 (1992).

Neb. Rev. Stat. § 43-263 (Reissue 1993) provides that upon filing the petition, summons shall be served upon "the person who has custody of the juvenile or with whom the

juvenile may be staying." Neb. Rev. Stat. § 43-265 (Reissue 1993) provides: "If the person so summoned under section 43-263 is other than a parent or guardian of the juvenile, then the parent or guardian or both, if their residence is known, shall also be notified of the pendency of the case and of the time and place appointed . . . ." Neb. Rev. Stat. § 43-262 (Reissue 1993) provides in part: "No summons or notice shall be required to be served on any person who shall voluntarily appear before the court and whose appearance is noted on the records thereof." The record of each of the several hearings shows that Robert was present. We therefore conclude that the juvenile court acquired jurisdiction without service upon Robert.

■ Section 43-247 provides in significant part: "[T]he juvenile court's jurisdiction over any individual adjudged to be within the provisions of this section shall continue until the individual reaches the age of majority or the court otherwise discharges the individual . . . ." Since the juvenile court acquired jurisdiction, it is not required to divest itself of jurisdiction upon a motion showing that the proceedings were not instituted against the parent. We also conclude that this result is necessary because if a child is in need of protection, then the juvenile court should first and foremost look to the protection of the child, even if the proper persons were not notified or allowed to participate. However, this is not to say that the adjudication has any effect upon the rights of the excluded parent. If a parent is not accorded his or her due process rights, the parent can readily appear and ask the court to terminate jurisdiction upon a showing that the child is no longer in need of protection.

In this particular case, Robert did not make any showing that Amanda was no longer in need of protection, and therefore the fact that he was made a party is not in and of itself sufficient to require the juvenile court to terminate jurisdiction.

### Robert's Due Process Rights.

The above is not to say that Robert's due process rights were not seriously violated or that he does not have a remedy. A parent deprived of his or her due process rights with regard to a child will always have a remedy.

The constitutional rights of parents are well known, but a summary of some of the applicable principles will put those rights in perspective. "The right of parents to maintain custody of their child is a natural right, subject only to the paramount interest which the public has in the protection of the rights of the child." *In re Interest of C.P.*, 235 Neb. 276, 284, 455 N.W.2d 138, 144 (1990). The relationship between a parent and child is constitutionally protected. *Quilloin v. Walcott*, 434 U.S. 246, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978); *In re Interest of L.V.*, 240 Neb. 404, 482 N.W.2d 250 (1992); *Shoecraft v. Catholic Social Servs. Bureau*, 222 Neb. 574, 385 N.W.2d 448 (1986). "The concept of due process embodies the notion of fundamental fairness and defies precise definition . . . ." *In re Interest of L.V.*, 240 Neb. at 413, 482 N.W.2d at 256–57.

Section 43–279.01(1) provides in significant part:

When the petition alleges the juvenile to be within the provisions of subdivision (3)(a) of section 43–247 . . . and the parent or custodian appears with or without counsel, the court shall inform the parties of the:

(a) Nature of the proceedings and the possible consequences . . . ;

(b) Right to engage counsel of their choice at their own expense or to have counsel appointed if unable to afford to hire a lawyer;

(c) Right to remain silent . . . ;

(d) Right to confront and cross–examine witnesses;

(e) Right to testify and to compel other witnesses to attend and testify;

(f) Right to a speedy adjudication hearing; and

(g) Right to appeal and have a transcript or record of the proceedings for such purpose.

The record clearly shows that Robert was never notified of these rights at any time, and the initial trial judge told him in effect that he had nothing to do with the proceedings. The record shows that at the April 13, 1994, hearing the initial judge gave Velma a reasonable explanation of these rights, except the right to counsel. However, the court addressed these remarks solely to Velma, and in no sense can these remarks be considered to have advised Robert of his rights. At the adjudication

hearing, the judge told Velma in the presence of Robert, "Well, he's [Robert's] not involved in the case." At the end of the first disposition hearing, the guardian ad litem expressed the opinion that Robert was the father and therefore a party and that "[m]y concern is down the road the big picture is taking care . . . ." To which the judge replied, "I know what you're concerned about. We'll take it up in chambers. It's got nothing to do with this child as filed."

We share the guardian's concern. If on one hand the father is capable of caring for the child, he is being deprived of a constitutionally protected right to his child. If on the other hand he is not capable of caring for the child, the welfare of the child and the rights of the public to an efficient disposition of such juvenile matters are adversely and seriously affected. One does not need to have great familiarity with juvenile matters to realize that a great many of the proceedings under § 43–247(3)(a) end in a termination proceeding based upon Neb. Rev. Stat. § 43–292(6) and (7) (Reissue 1993) (providing for termination upon grounds that parent failed to correct conditions leading to determination under § 43–247(3)(a)). When a known parent claiming to be willing and able to care for a child is excluded from the proceeding, that proceeding cannot be used as a basis for terminating that parent's rights under § 43–292(6) and (7).

It seems self–evident that Robert was not treated with fundamental fairness. In fact, until a new judge became aware of the situation more than a year after the first hearing, Robert was only treated by being excluded. In *In re Interest of N.M. and J.M.*, 240 Neb. 690, 484 N.W.2d 77 (1992), the Supreme Court stated that parents are deprived of due process by the trial court's failure to tell them of the possibility of the termination of their parental rights and advise them of their right to have counsel. In the case *In re Interest of A.D.S. and A.D.S.*, 2 Neb. App. 469, 511 N.W.2d 208 (1994), this court held a parent's due process rights were violated when the parent was not given the explanation required under § 43–279.01(1), and the cause was remanded for a new adjudication hearing.

It seems clear that a parent who is deprived of due process is entitled to litigate his rights anew without prejudice from the adjudication proceedings from which he was excluded.

*Lack of Jurisdiction of Amanda.*

This proceeding has even more serious flaws than the failure to allow the father to participate in the proceeding.

The petition alleges Amanda is lacking proper care by reason of the faults or habits of Velma in that Velma "suffers from manic depression and seizures which impair her ability to care for said child; she does not cooperate with her medical treatment." Velma admitted "the charges." She said yes to the question: "[Y]ou're telling me the children lack proper parental care by reason of your faults or your habits in that you suffer from depression and seizures which impair your ability to care for the child, right?" Velma admitted she does not always follow her doctor's prescribed treatment. She admitted, "I have suicidal seizures and epileptic seizures." Velma said that she was living at the Open Door Mission, but that "within a month we're planning on moving out to 83rd and Maple." She also admitted Amanda is "approximately a year old." At the end of her interrogation, Velma answered yes to the question, "Now, you're admitting these things because they really indeed happened, right?" and no to the question, "Nobody's forcing you to do something against your will?"

Section 43-279.01(2) provides with respect to adjudications under § 43-247(3)(a):

> After giving the parties the information prescribed in subsection (1) of this section, the court may accept an in-court admission, an answer of no contest, or a denial from any parent or custodian as to all or any part of the allegations in the petition. *The court shall ascertain a factual basis for an admission or an answer of no contest.*

(Emphasis supplied.)

We are unable to locate any recitation of the factual basis for the finding that Amanda was a juvenile defined in § 43-247(3)(a), nor are we able to find any evidence, stipulations, or statements in the record which would support such a finding. Velma admitted to conclusions contained in the petition.

With regard to the failure of a trial court to find a factual basis, the Supreme Court has held that the failure of a juvenile court to recite a factual basis in an adjudication hearing

constitutes plain error that results in damage to the integrity, reputation, and fairness of the judicial process. *In re Interest of D.M.B.*, 240 Neb. 349, 481 N.W.2d 905 (1992). In *In re Interest of D.M.B.*, the Supreme Court went on to conclude that the failure of the juvenile court to recite a factual basis for the adjudication at an adjudication hearing caused the juvenile court to lack jurisdiction to later terminate parental rights. We think that in the case at hand it was plain error for the trial court to claim jurisdiction of Amanda because it failed to recite the factual basis for jurisdiction and that therefore the father's motion for termination of jurisdiction should have been granted.

This particular case has another troubling jurisdictional aspect. The allegation is that Amanda lacks proper parental care by reason of the faults or habits of her mother, Velma, in that Velma suffers from manic depression and seizures. We are loath to accept any finding of a fact which is based upon the premise that if a person suffers from recognized medical conditions, such as manic depression, major depression, and seizures, then that parent is not going to give his or her children proper care. The record contains no evidence showing how Velma's medical problems affect her ability to care for Amanda, and the evidence shows that her seizure problem caused Velma to fall once.

There is also a question of whether a particular mental condition is the fault of the person suffering from it. Section 43–247(3)(a) allows proceedings involving a juvenile "who is homeless or destitute, or without proper support through no fault of his or her parent." We realize that people that suffer from mental illness may have faults or habits which endanger their children and in the proper condition might allow the court to take jurisdiction under § 43–247(3)(a), but we seriously dispute any notion that proof that a person suffers from the conditions known as depression or seizures is proof that that person is incapable of giving his or her children proper care.

In this case, the State established Velma's medical condition by her admissions that she suffered from depression and seizures. Even if one includes the testimony of Wilkins at the previous hearing, that testimony establishes nothing other than that unknown doctors and the parent of questionable education

said she suffers from depression and seizures. There is no evidence as to how the symptoms of either disease manifest themselves in Velma, or generally in members of the public who suffer from those diseases, or how Velma is unable to care for Amanda because of these medical conditions.

The evidence also suggested that Velma had an alcohol and drug abuse problem, but again the evidence does not establish the nature and extent of Velma's problem with substance abuse or if the problem was great enough to endanger Amanda. The record leads one to believe that Velma has had habits that might support a finding that Amanda will lack proper care by reason of Velma's faults or habits, but no such evidence was introduced. Instead, the State rested on proof of Velma's admission to suffering "from manic depression and seizures."

We therefore conclude that the adjudication hearing did not give the juvenile court jurisdiction over Amanda. We also realize that it is quite likely that a proper hearing could establish that Amanda is in danger of not receiving proper care. We therefore direct that the juvenile court dismiss the proceedings, but that such dismissal shall be without prejudice to any new proceedings if the facts at the time of the filing of new proceedings justify such proceedings.

REVERSED AND REMANDED WITH DIRECTIONS TO DISMISS.