579 N.W.2d 17 (1998)
1998 SD 47
In the Matter of C.V., Alleged Abused/Neglected Child.
No. 20277.
Supreme Court of South Dakota.
Considered on Briefs March 12, 1998.
Decided May 13, 1998.
*18 D. Sonny Walter, Sioux Falls, for appellant, Father.
Mark W. Barnett, Attorney General, Joan P. Baker Assistant Attorney General, Pierre, for appellee, State of South Dakota.
Laurel Olson Eggers of Laurel Olson Eggers PC, Sioux Falls, for appellee, Child.
KONENKAMP, Justice.
[¶ 1.] We are faced with the question whether in an abuse and neglect proceeding the circuit court violated a father's statutory and due process rights in failing to conduct an adjudicatory hearing, when it nonetheless provided him a dispositional hearing before terminating his parental rights. We conclude the court erred in not holding an adjudicatory hearing for the father, but nonetheless affirm because in the unique circumstances of this case, remanding to conduct such hearing would not change the outcome.

Facts
[¶ 2.] On September 13, 1993, with his two-year-old daughter, C.V., nearby, the father grabbed the mother's head and bit off her nose. It was his latest and most brutal act in a succession of violent acts against her. For this shocking savagery he received six years in the penitentiary. When the trial court terminated his parental rights four years later, he was still in prison, but was scheduled for discharge within weeks. An illegal alien classified under immigration law as an "aggravated felon," he was subject to immediate deportation upon release. During his time in prison he participated in alcohol treatment, yet declined counseling for domestic abuse. "I don't need it," he told the judge at the dispositional hearing. Although he was a virtual stranger to his child, he also informed the court that when he departed for Mexico, he wanted C.V. with him. Little in the record would commend such a result.
[¶ 3.] C.V. was born out-of-wedlock to the father and F.R.B. (mother) in 1991. They later married. C.V. was the mother's ninth child, but the father and mother's first. Over the years, aside from the father's adverse influence, the mother had her own desperate problems caring for her older children. One was killed in an accident. Another suffered brain damage when she beat the child, which resulted in her conviction for aggravated assault. The mother's remaining children were removed from her care by the Department of Social Services (DSS) due to her chronic alcoholism, homelessness, and frequent encounters with domestic violence. The many services DSS provided in connection with her older children were ineffective in correcting her problems.
[¶ 4.] C.V. was first removed from her parents' custody as a result of an incident of domestic violence in 1991 when she was only five weeks old. The mother was arrested for DUI and the father for assault in striking the mother and biting her on the face. Because of the parents' continuing problems with violence, alcoholism and homelessness, it was a year before C.V. was returned to their care. In 1993, the father was arrested and convicted of aggravated assault for the previously mentioned nose biting incident. While he was in prison, the mother's alcoholic excesses persisted and DSS received numerous referrals concerning her neglectful childcare. C.V. was finally removed from mother's custody when, despite repeated warnings from DSS, she left the child with a caregiver physically incapable of providing for the child.
[¶ 5.] On July 30, 1996, the State filed a petition alleging C.V. to be abused and neglected. A summons was issued notifying the parties of an adjudicatory hearing on the *19 petition scheduled for October 3. On September 30, the trial court issued an order directing that the father be transported from the penitentiary to the courthouse for the October 3 hearing. The level of the father's participation at the hearing is unclear although he apparently was present. In any event, no adjudicatory hearing took place because mother, her counsel, the lawyer for C.V., and the deputy state's attorney stipulated that C.V. was abused and neglected. Based upon the stipulation, the trial court entered an adjudicatory order finding C.V. abused and neglected. The order also set forth conditions the mother would have to meet during the pendency of the dispositional hearing to retain her parental rights.
[¶ 6.] The mother did not meet the court's dispositional conditions and a hearing was noticed for August 5, 1997. At the hearing, all parties, including the father, were present and represented by counsel. Though she did not stipulate to termination of her parental rights, the mother essentially agreed not to contest the State's evidence. The father made no such agreement. He and his attorney participated in the hearing with a full opportunity to confront the dispositional witnesses and cross-examine them. The father's history of abusive treatment of the mother and his neglect of C.V. before he went to prison was presented through several State witnesses. On the stand, he admitted assaulting the mother and striking the mother's youngest son with a belt, but excused it by saying he was teaching the child a lesson on not hitting people. At the close of all the evidence, his counsel expressed some confusion over whether the hearing was adjudicatory or dispositional. The trial court advised that, because of mother's stipulation of abuse and neglect and the adjudication based upon her stipulation, the hearing was dispositional. The father immediately objected on the basis he was never afforded an adjudicatory hearing. His objections were overruled and the trial court later entered findings of fact, conclusions of law and an order terminating the mother's and the father's parental rights over C.V. The father appeals.

Jurisdiction to Terminate Parental Rights Absent Adjudicatory Hearing
[¶ 7.] The father argues the trial court had no jurisdiction to conduct the dispositional hearing and to terminate his parental rights because it failed to first hold an adjudicatory hearing. When the father objected during the dispositional hearing to the fact no adjudicatory hearing was held, the trial court reasoned such a hearing was unnecessary because of the mother's stipulation of abuse and neglect. Pointing out the adjudicatory hearing decides the status of the child, without necessarily assigning fault to either parent, the court denied the father's repeated requests for an adjudicatory hearing. In support of its determination, the court relied upon the following pertinent language from SDCL 26-8A-1: "[a]djudication of a child as an abused or neglected child is an adjudication of the status or condition of the child who is the subject of the proceedings and is not necessarily an adjudication against or in favor of any particular parent, guardian or custodian of the child."
[¶ 8.] The court's reasoning overlooked the father's status as an interested party.[1] SDCL 26-7A-43 makes both parents parties to abuse and neglect proceedings by requiring that "parents" (plural) be included as named respondents in a petition. A summons for the hearing on a petition must be directed to both "parents." SDCL 26-7A-44. The summons must also be served on all the "persons or parties named" therein. SDCL 26-7A-47.[2] "Every person or party" who receives a summons may appear and answer in response to the petition. SDCL 26-7A-53 (emphasis added). Most importantly, if a petition for abuse and neglect is "not admitted by all necessary parties" or if the petition is "denied by any necessary party," the trial court, "shall proceed with *20 the adjudicatory hearing on the petition[.]" SDCL 26-7A-55 (emphasis added). Obviously, if after proper notice a parent fails to appear, the court may enter a default, but that did not occur here. SDCL 26-7A-53. The trial court omitted mandatory procedural requirements in bypassing the adjudicatory hearing for the father based upon the mother's stipulation alone. Under the above statutes, however, the court could only dispense with an adjudicatory hearing if all of the necessary parties, including the father, agreed. Here, the father did not agree. Thus, the trial court denied the father an adjudicatory hearing under SDCL 26-7A-55.
[¶ 9.] Normally, parents denied due process are entitled to litigate their "rights anew without prejudice from the adjudication proceedings from which [they were] excluded."[3]In Interest of Amanda H., 4 Neb.App. 293, 542 N.W.2d 79, 87 (1996). Yet, at this juncture we must ask if reversing for an adjudicatory hearing will truly produce any rational possibility of a different result. C.V. has waited for years on her dysfunctional parents and all a reversal seems to promise is more delay. The Nebraska Supreme Court confronted a similar quandary in the case of In Re Interest of Amber G., 250 Neb. 973, 554 N.W.2d 142 (1996). Two children were removed from their mother's care due to reports of sexual abuse and neglect. The father was not present for the adjudicatory hearing and was not named as a parent in the petitions filed on behalf of the children. On appeal from an order of permanent guardianship for the children, the father challenged the juvenile court's jurisdiction because it was never alleged he abused and neglected the children. In rejecting his contentions, the Court held:
[T]he rights of the parent and the child are protected by the separate adjudication and dispositional phases of the dependency proceeding. A petition ... is brought on behalf of the child, not to punish the parents. The purpose of the adjudication phase of the proceeding is to protect the interests of the child; the purpose of the dispositional phase is to determine placement and the rights of the parties in the action. It is not improper for the court to sustain jurisdiction at the adjudication phase if the State makes a proper prima facie showing of lack of proper parental care in the child's present living situation.
In this case, the issue at the adjudication phase was whether the children lacked proper parental care in the custody of their mother. The question of whether the father was fit or unfit to have custody did not arise and should not have arisen until the dispositional phase. The record clearly indicates that the mother admitted to the allegations of the petitions at each adjudication, and thus the juvenile court could properly take jurisdiction ... To protect the minor children involved in this case from further abuse in the mother's home, the court took jurisdiction and removed the children from their mother's custody. Because we find that the juvenile court properly took jurisdiction at the adjudication phase of this case, we find the father's assignment of error as to jurisdiction to be without merit.
Amber G., 554 N.W.2d at 148 (citations omitted). See also Amanda H., 542 N.W.2d at 86 (if child needs protection, then juvenile court must first look to protection of child even if proper persons were not allowed to participate). Here, at the time the petition was filed, the father was confined in the penitentiary for an appallingly brutal assault on the mother. Although incarceration itself is not a sufficient reason to terminate parental rights, a father in prison is obviously unable to provide for his children or to perform normal parental duties. Matter of R.P., 498 N.W.2d 364, 368 (S.D.1993). Thus, between the mother's stipulation of abuse and neglect and the father's inability to care for the child, there can be no doubt that, even had an adjudicatory hearing been held, C.V. would have been found abused and neglected.[4]
*21 [¶ 10.] The Iowa Supreme Court faced a similar procedural defect in the case of In Interest of T.C., 492 N.W.2d 425 (Iowa 1992). There, the parents of three children were separated and the children were in the physical care and control of their mother. An adjudicatory hearing was held while the father was confined in a locked hospital mental ward on an involuntary substance abuse commitment. He did not appear at the adjudicatory hearing nor was he represented by anyone. Just as in this case, the children's attorney and their mother and her attorney stipulated the children were in need of assistance and the court entered its order in accord with the stipulation. The father's parental rights were subsequently terminated. On appeal, the father claimed a denial of due process due to his incarceration and lack of representation at the adjudicatory hearing. In rejecting that argument, the Iowa Supreme Court observed:
[W]e do not believe that a failure to appoint a guardian ad litem for [the father] in the [adjudicatory] proceeding voids the legal effect of the termination proceeding. At the [adjudicatory] proceeding, W.C., the children's mother, and her attorney stipulated that the children were in need of assistance. [The father] was obviously not able to provide the help that the children then needed. Had he been present, it is completely unlikely that the court would have entered any order different from what it did.
Interest of T.C., 492 N.W.2d at 429. The same is true here.[5]
[¶ 11.] At every stage, from initial appearance to final disposition, our brightest beacon is the best interests of the child. Matter of R.P., 498 N.W.2d at 366. Children have so little time to be children. Remanding for an adjudicatory hearing at this stage would accomplish nothing but unfairly delay the child's right to a safe, caring, permanent home.[6] We cannot squander childhood's precious *22 hour in an empty quest for exactitude. See Matter of C.L., 397 N.W.2d 81, 88 (S.D. 1986) ("Their time is now[.]") (Henderson, J., concurring in result) (emphasis original). "`Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.'" Delaware v. Van Arsdall, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674, 685 (1986) (quoting R. Traynor, The Riddle of Harmless Error 50 (1970)). The court should have held an adjudicatory hearing for the father, but we conclude its failure to do so was harmless error beyond a reasonable doubt. See Phyle, 491 N.W.2d at 435-36 (error even of constitutional dimension may be deemed harmless where it had no effect on final result). Accordingly, we hold the trial court's adjudication based on the mother's stipulation was sufficient to confer jurisdiction on the trial court to conduct the dispositional hearing and to enter its later order terminating the father's parental rights.
[¶ 12.] Affirmed.
[¶ 13.] MILLER, C.J., and AMUNDSON and GILBERTSON, JJ., concur.
[¶ 14.] SABERS, J., dissents.
SABERS, Justice (dissenting).
[¶ 15.] What power we wield! We can predict "that there can be no doubt" that a proceeding which never occurred "would accomplish nothing." Based upon that prediction, we can deny Father his constitutionally guaranteed right to due process without even mentioning the Fourteenth Amendment to the United States Constitution. Nowhere in Fourteenth Amendment jurisprudence has it ever been written that the Due Process clause may be ignored because the person denied his rights thereunder was sure to lose anyway.[7] In fact, the opposite is true:
[The] State [cannot] refuse to provide natural parents adequate procedural safeguards on the ground that the family unit already has broken down; that is the very issue the [adjudicatory proceeding] is meant to decide.
Santosky v. Kramer, 455 U.S. 745, 754 n. 7, 102 S.Ct. 1388, 1395 n. 7, 71 L.Ed.2d 599, 606-07 n. 7 (1982).
The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.
Id. at 753-54, 102 S.Ct. at 1394-95, 71 L.Ed.2d at 606.
[¶ 16.] The majority relies almost entirely upon Nebraska and Iowa authority to support its conclusion and relegates Santosky to a footnote; however, it is beyond dispute that this court is required to follow United States Supreme Court constitutional interpretations:

*23 Article VI of the Constitution makes the Constitution the "supreme Law of the Land." In 1803, Chief Justice Marshall, speaking for a unanimous Court, referring to the Constitution as "the fundamental and paramount law of the nation," declared in the notable case of Marbury v. Madison, 5 U.S. 137, 1 Cranch 137, 177, 2 L.Ed. 60, that "It is emphatically the province and duty of the judicial department to say what the law is." This decision declared the basic principle that the federal judiciary is supreme in the exposition of the law of the Constitution, and that principle has ever since been respected by this Court and the Country as a permanent and indispensable feature of our constitutional system. It follows that the interpretation of the Fourteenth Amendment enunciated by this Court ... is the supreme law of the land, and Art. VI of the Constitution makes it of binding effect on the States "any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Every state legislator and executive and judicial officer is solemnly committed by oath taken pursuant to Art. VI, cl. 3, "to support this Constitution." [. . .]
Cooper v. Aaron, 358 U.S. 1, 18, 78 S.Ct. 1401, 1409-10, 3 L.Ed.2d 5, 16-17 (1958); accord Baker v. Carr, 369 U.S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663, 682 (1962) (Supreme Court is "ultimate interpreter of the Constitution"); Steiner v. County of Marshall, 1997 SD 109, ¶ 36, 568 N.W.2d 627, 634 (Miller, C.J., concurring in result) ("State courts are not required to follow United States Supreme Court precedent unless the result therein is mandated by the Constitution of the United States.") (citations omitted) (emphasis added); State v. Buffalo Chief, 83 S.D. 131, 137, 155 N.W.2d 914, 917 (1968) ("[T]his court is bound by decisions of the United States Supreme Court in construing [constitutional] provisions.").
[¶ 17.] Clearly, Santosky does not permit a harmless error analysis.[8] The interests of the child cannot be used as an excuse for the denial of Father's constitutionally guaranteed right to due process: "The fact that important liberty interests of the child and its foster parents may also be affected by a permanent neglect proceeding does not justify denying the natural parents constitutionally adequate procedures." Santosky, 455 U.S. at 754 n. 7, 102 S.Ct. at 1395 n. 7, 71 L.Ed.2d at 606-07 n. 7 (emphasis in original); see also SDCL 26-7A-56 (discussing procedure for adjudicatory hearings and providing that the court should determine "the least restrictive alternative available in keeping with the child's best interests and with due regard for the rights and interests of the parents[.]") (emphasis added).
[¶ 18.] This court has stated that "[i]ncarceration itself is not sufficient reason to terminate parental rights." In re R.P., 498 N.W.2d 364, 368 (S.D.1993). It is axiomatic that Mother cannot stipulate away Father's rights. Upon what basis then does the majority reach its conclusion? Mother's stipulation and Father's incarceration! Based on those two factors, the majority states, an adjudicatory hearing would "accomplish nothing."
[¶ 19.] "[A] parent who is deprived of due process is entitled to litigate his rights anew without prejudice from the adjudication proceedings from which he was excluded." In re Amanda H., 4 Neb.App. 293, 542 N.W.2d 79, 87 (1996):
A parent deprived of his or her due process rights with regard to a child will always have a remedy.
. . .
If on one hand the father is capable of caring for the child, he is being deprived of a constitutionally protected right to his child. If on the other hand he is not capable of caring for the child, the welfare of the child and rights of the public to an efficient disposition of such juvenile matters are adversely and seriously affected *24 [when his due process rights are violated]. . . . When a known parent claiming to be willing and able to care for a child is excluded from the proceeding, that proceeding cannot be used as a basis for terminating that parent's rights[.]
Id. 542 N.W.2d at 86-87 (emphasis added).
[¶ 20.] In time of war, Presidents have rightly or wrongly attempted to suspend constitutional rights. Today, the majority of the South Dakota Supreme Court suspends the Due Process Clause of the Constitution of the United States. What is today's crisis? Oh nothing, just the irksome obligation to go back and do it right. As for me, the end does not justify the means. Clearly, this shortcut is not worth it. I took an oath to uphold the Constitution, not suspend it. We must reverse and remand to allow Father the opportunity to litigate his rights. The Constitution permits nothing less.
NOTES
[1] See Santosky v. Kramer, 455 U.S. 745, 753-54, 102 S.Ct. 1388, 1395, 71 L.Ed.2d 599, 606 (1982) (when the State moves to destroy familial bonds, it must provide the parents with fundamentally fair procedures).
[2] If one of the parents is unknown or cannot be located, adequate provision is made for service of the summons by publication. See SDCL 26-7A-44; 26-7A-48.
[3] Or, in this case, without prejudice from the stipulated adjudication the father did not join.
[4] The dissent submits, "[n]owhere in Fourteenth Amendment jurisprudence has it ever been written that the Due Process Clause may be ignored because the person denied his rights thereunder was sure to lose anyway." (emphasis original). First, this misstates our holding. We do not hold the trial court was entitled to "ignore" father's due process rights. Rather, we hold the trial court erred in denying father an adjudicatory hearing. Second, it is well settled that, "`error even of constitutional dimension may be deemed harmless[.]'" Phyle v. Leapley, 491 N.W.2d 429, 435-36 (S.D.1992) (quoting State v. Garritsen, 421 N.W.2d 499, 501 (S.D.1988)). "We apply the harmless error rule to constitutional violations, but only when `the court is able to declare a belief beyond a reasonable doubt that the error was harmless and did not contribute to the verdict obtained.'" Application of Novaock, 1998 SD 3, ¶ 10, 572 N.W.2d 840, 843 (emphasis original) (quoting State v. Michalek, 407 N.W.2d 815, 819 (S.D.1987). See also State v. Jaques, 428 N.W.2d 260, 266 (S.D.1988) (possible constitutional error deemed harmless because of "overwhelming weight of evidence" depicting defendant's guilt). Thus, deeming constitutional error harmless in the light of overwhelming evidence is nothing novel. Furthermore, it is perfectly consistent with settled federal law. See e.g. Seiler v. Thalacker, 101 F.3d 536, 539-40 (8th Cir.1996) (constitutional error harmless beyond a reasonable doubt if what was actually and properly considered in the decision-making process was so overwhelming that the decision would have been the same even absent the invalid factor). See also Arizona v. Fulminante, 499 U.S. 279, 306, 111 S.Ct. 1246, 1263, 113 L.Ed.2d 302, 329 (1991) (Supreme Court has applied harmless error analysis to a wide range of errors and has recognized that "most" constitutional errors can be harmless).
[5] Contrary to the assertion of the dissent, reliance on T.C. is not misplaced. Despite the father's absence from the adjudicatory proceedings in T.C., the Iowa Court offered two rationales to uphold termination of his parental rights. The first was that even if the father had been present at the adjudicatory hearing, it was completely unlikely the court would have entered any order different than the one it did. This is the very same sort of harmless error analysis we use here. The second rationale pointed out the father's presence with counsel at the dispositional proceeding and his ability under Iowa law to relitigate any errors of fact that gave rise to the original adjudication his children were in need of assistance. While the dissent submits that, under South Dakota law, the father had no similar opportunity for relitigation in the instant case, that is not entirely accurate. He was present with counsel at the dispositional hearing. Moreover, where termination of parental rights is a potential outcome at a dispositional hearing, South Dakota law provides one of the appropriate considerations is whether, "the conditions which led to the removal of the child still exist[.]" SDCL 26-8A-26. Thus, evidence of the conditions at the time of the removal and of any change in those conditions by the time of the disposition is entirely relevant at the dispositional hearing. In that context, the father, just as the father in T.C., could easily have contrasted the difference in any conditions in existence at the time of C.V.'s removal from the home.
[6] Evidence at any adjudicatory hearing held on remand would be limited to the circumstances affecting the child at the time of the filing of the petition. See SDCL 26-7A-83 (evidence relating to allegations of petition or circumstances then affecting the child is to be considered at adjudicatory hearing). Here, it is beyond dispute the father was incarcerated and, by that fact alone, he was unable to care for the child at the time of the filing of the petition.
[7] The majority's reliance on In re T.C., 492 N.W.2d 425 (Iowa 1992), is misplaced. Under Iowa law, before parental rights can be terminated at the dispositional hearing, the court must find by clear and convincing evidence that "at the present time" the child cannot be returned to its parents. Id. at 428. Therefore, the T.C. court noted that Father could have contested the adjudication at the termination hearing, which he attended with counsel. Id. at 429.

In comparison, South Dakota law does not provide for another adjudication at the dispositional hearing. Compare SDCL 26-7A-90 (providing for the submission of dispositional evidence), with SDCL 26-7A-56 (providing procedure to inform court of child's status). Obviously, Father's attempts here to convince the court that he was entitled to participate at the adjudicatory stage were futile.
[8] The inapplicability and inappropriateness of a harmless error analysis is obvious. A harmless error analysis necessarily invokes an inquiry whether the outcome of the proceeding would have been different absent the constitutional error. Here, there is no proceeding to analyze. The termination of parental rights is affirmed in an overwhelming majority of cases. Under the majority opinion, adjudicatory hearings could be dispensed with in all of those cases because they would "accomplish nothing."